101 Cal.Rptr.2d 701 (2000)
24 Cal.4th 603
12 P.3d 1110
The PEOPLE, Plaintiff and Respondent,
v.
Danny DUARTE, Defendant and Appellant.
No. S068162.
Supreme Court of California.
December 4, 2000.
*704 Dennis A. Fischer, Santa Monica, under appointment by the Supreme Court; Maureen DeMaio, Santa Barbara, under appointment by the Court of Appeal; Law Offices of Dennis A. Fischer and John M. Bishop, Riverside, for Defendant and Appellant.
Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson and David P. Druliner, Chief Assistant Attorneys General, Carol Wendelin Pollack, Assistant Attorney General, Robert Carl Schneider, Sanjay T. Kumar, Robert F. Katz and Peggie Bradford Tarwater, Deputy Attorneys General, for Plaintiff and Respondent.
WERDEGAR, J.
The jury in this case convicted defendant Danny Duarte of shooting at an inhabited dwelling, conspiracy, and assault with a firearm after the court admitted into evidence a police sergeant's hearsay testimony relating an alleged accomplice's postarrest declarations that implicated defendant as well as the declarant. We conclude the trial court committed prejudicial error in admitting the hearsay evidence. We therefore affirm the judgment of the Court of Appeal reversing defendant's conviction.

Background
As stated by the Court of Appeal, the relevant facts are as follows.
On an October evening in 1994, Leslie Sullivan was working at the computer in her home while her two children were down the hall sleeping. Suddenly, a barrage of bullets hit the house. Running toward the children's room, Ms. Sullivan was struck in the thigh with an assault rifle bullet. Ventura County Sheriffs deputies later found numerous shell casings and spent rounds, including some from a nine-millimeter weapon and some from a 7.62 millimeter assault rifle, in front of the Sullivan residence.
Police officers served search warrants at the residences of Eran Knox, William (Billy) Morris and defendant. At defendant's residence, the officers recovered a .22-caliber revolver, a 12-gauge shotgun, ammunition, gun cleaning kits and photographs of handguns. None of the recovered guns or ammunition matched those used in the attack at the Sullivan home. Defendant refused to talk to the police officers and was arrested.
No evidence was recovered at Knox's residence, but he was handcuffed and transported to the police station. There, Knox told officers that, on the evening of the shooting, he, Morris and defendant met with friends at Borchard Park, where they smoked marijuana and drank rum. Defendant suggested they shoot at the residence of Tarn Nguyen in retaliation for a shooting several months earlier. Knox and Morris initially refused, but defendant persuaded Morris to join him. Defendant, Morris and Gilberto Lopez left in Morris's car; Knox stayed behind. A short time later, Knox heard gunshots. Subsequently, Knox telephoned his brothers and asked them to pick him up at the park. As he was waiting for his brothers to *705 arrive, Knox saw defendant, Morris and Lopez return. Knox also told officers he previously had seen at defendant's house a Tec-9 and an SKS assault rifle and ammunition for each of these firearms.
At Morris's residence, officers recovered ammunition for a nine-millimeter weapon and a 7.62-millimeter weapon and paraphernalia for an SKS assault rifle. Several 7.62-millimeter casings found in Morris's backpack were made the same year and by the same manufacturer as those found outside the Sullivan residence. Morris was arrested, waived his rights under Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, and spoke to the officers. During the interview, Morris incriminated himself and defendant, saying, among other things, that they had realized from news accounts that they had shot at the wrong house.
Defendant and Morris were tried separately, Morris first. Morris was convicted and sentenced to the care of the California Youth Authority. Knox and Morris both testified at defendant's first trial, which ended in a mistrial when the jury was unable to reach a verdict. Several jurors subsequently indicated they had been concerned about the reliability of Knox's testimony, which had been impeached with his prior inconsistent statements.
At defendant's second trial, the subject of this appeal, Knox again testified, and again his testimony was extensively impeached. Witnesses identified omissions and inconsistencies in his statements relating to, e.g., who was in Borchard Park on the night of the shooting and at what time, events in the park that night, the time at which Knox heard gunshots, marijuana and rum consumption by those present, Knox's movements and the movements of others, who was in the car and where, what kinds of guns Knox saw (or did not see) at defendant's residence, and the "slim jimming"[1] of an automobile.
Morris invoked his Fifth Amendment right not to testify, an invocation the parties stipulated was valid due to his possible prosecution for perjury should he testify. The court denied defendant's motion to exclude any evidence of Morris's postarrest statements, ruling that the statements, redacted to omit any reference to Morris's companions, were admissible as being against Morris's penal interest (Evid.Code, § 1230, hereafter section 1230) and were relevant to corroborate Knox's testimony. The statements were placed into evidence by Sergeant Frank O'Hanlon, who testified about what Morris had said to him after he was arrested.
During deliberations, the jury inquired twice about Morris's statements (asking to see Morris's "confession ... in its entirety") and once about Knox's testimony.
Defendant was convicted of shooting at an inhabited dwelling (Pen. Code, § 246), conspiracy to shoot at an inhabited dwelling (id., §§ 182, subd. (a)(1), 246) and assault with a firearm (id, § 245, subd. (a)(2)). The jury also found true a personal-firearm-use enhancement (id, § 12022.5, subd. (a)(1)). Defendant was sentenced to a prison term of nine years.
On appeal, the Court of Appeal, one justice dissenting, held that the trial court erred in admitting Morris's redacted statements because they did not satisfy the reliability requirement of section 1230 and, in addition, their admission violated defendant's rights under the confrontation clause of the Sixth Amendment to the United States Constitution. Finding that the trial court's erroneous admission of the statements was not harmless beyond a reasonable doubt (Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705), the Court of Appeal reversed defendant's conviction.
We granted the People's petition for review and now affirm the judgment of the Court of Appeal.

*706 Discussion

Having invoked his Fifth Amendment right not to incriminate himself, Morris was, for hearsay rule purposes, not available as a witness. (Evid.Code, § 240, subd. (a)(1); People v. Gordon (1990) 50 Cal.3d 1223, 1251, 270 Cal.Rptr. 451, 792 P.2d 251, overruled on another point in People v. Edwards (1991) 54 Cal.3d 787, 835, 1 Cal.Rptr.2d 696, 819 P.2d 436.) Accordingly, at his second trial defendant was afforded no opportunity to cross-examine Morris.
Defendant contends, and the Court of Appeal agreed, that the trial court erred in admitting under section 1230 Sergeant O'Hanlon's testimony relating Morris's postarrest statements. Defendant also contends that the Court of Appeal correctly reversed his conviction because it was obtained in contravention of the federal constitutional guarantee, made applicable to the states through the Fourteenth Amendment (Pointer v. Texas (1965) 380 U.S. 400, 403-405, 85 S.Ct. 1065, 13 L.Ed.2d 923), that the accused in a criminal prosecution shall enjoy the right to be confronted with the witnesses against him (U.S. Const., 6th Amend.).
"It is well established that `we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us.'" (People v. Leonard (1983) 34 Cal.3d 183, 187, 193 Cal.Rptr. 171, 666 P.2d 28.) Accordingly, before addressing defendant's confrontation clause claim, we examine his claim of error respecting the trial court's evidentiary ruling.

A. Evidence Code Section 1230
Sergeant O'Hanlon's testimony relating Morris's postarrest statements, admitted for the truth of those statements, was hearsay. (Evid.Code, § 1200, subd. (a).) Unless it falls within an exception to the general rule, hearsay is not admissible. (Id., subd. (b).) "The chief reasons for this general rule of inadmissibility are that the statements are not made under oath, the adverse party has no opportunity to cross-examine the declarant, and the jury cannot observe the declarant's demeanor while making the statements." (People v. Fuentes (1998) 61 Cal.App.4th 956, 960-961, 72 Cal.Rptr.2d 237; see also Williamson v. United States (1994) 512 U.S. 594, 598-599, 114 S.Ct. 2431, 129 L.Ed.2d 476 [discussing similar rationale underlying federal hearsay rule].)
In California, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, ... so far subjected him to the risk of ... criminal liability ... that a reasonable man in his position would not have made the statement unless he believed it to be true." (§ 1230.) The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. (People v. Lucas (1995) 12 Cal.4th 415, 462, 48 Cal.Rptr.2d 525, 907 P.2d 373.)
There is no dispute that Morris was unavailable. The question, therefore, is whether the trial court correctly determined that Morris's declaration was both against his penal interest and otherwise sufficiently reliable to warrant admission despite its hearsay character.

1. Against declarant's penal interest
Morris's postarrest statements to police, as related in Sergeant O'Hanlon's testimony, indisputably contained admissions that appear on their face to be contrary to Morris's interest in avoiding criminal liability or punishment. Among other things, Sergeant O'Hanlon testified that, while sitting in the police car after his arrest for shooting at the Sullivan house a little over a month after the incident occurred, Morris stated he had committed a drive-by shooting in retaliation for an earlier shooting *707 but that the wrong house had been shot.
At the police station a short time later, Morris provided details. The sergeant testified that Morris stated he had been at Borchard Park "hanging out" with friends when, against the urging of one of them, Eran Knox, he decided to do the shooting and armed himself with a Tec-9 semiautomatic machine gun having a long clip. Morris related that he left the park in his own car, went by the house twice and, upon observing a light in the window, fired about 30 shots at the house. These statements tended, generally, to implicate Morris in criminal activity.
Nevertheless, "the precedents in the hearsay area provide a persuasive reminder that declarations against penal interest may contain self-serving and unreliable information" and, consequently, "an approach which would find a declarant's statement wholly credible solely because it incorporates an admission of criminal culpability is inadequate." (People v. Campa (1984) 36 Cal.3d 870, 883, 206 Cal.Rptr. 114, 686 P.2d 634, italics in original.) As scholars have observed, "`a self-serving statement lacks trustworthiness whether it accompanies a disserving statement or not.'" (People v. Leach (1975) 15 Cal.3d 419, 439, fn. 15, 124 Cal.Rptr. 752, 541 P.2d 296 (Leach ), quoting Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule (1944) 58 Harv. L.Rev. 1, 60.) Moreover, that a hearsay statement may be facially inculpatory or neutral cannot always be relied upon to indicate whether it is "truly self-inculpatory, rather than merely [an] attempt[ ] to shift blame or curry favor." (Williamson v. United States, supra, 512 U.S. at p. 603, 114 S.Ct. 2431.) Even a hearsay statement that is facially inculpatory of the declarant may, when considered in context, also be exculpatory or have a net exculpatory effect. (See, e.g., People v. Coble (1976) 65 Cal.App.3d 187, 191, 135 Cal. Rptr. 199.) Ultimately, as the high court has noted, "whether a statement is self-inculpatory or not can only be determined by viewing it in context." (Williamson v. United States, supra, at p. 603, 114 S.Ct. 2431.)
In view of such concerns, and as the People concede, we long ago determined that "the hearsay exception should not apply to collateral assertions within declarations against penal interest." (People v. Campa, supra, 36 Cal.3d at p. 882, 206 Cal.Rptr. 114, 686 P.2d 634.) In order to "`protect defendants from statements of unreasonable men if there is to be no opportunity for cross-examination,'" we have declared section 1230's exception to the hearsay rule "inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant." (Leach, supra, 15 Cal.3d at p. 441, 124 Cal.Rptr. 752, 541 P.2d 296, fn. omitted; accord, People v. Shipe (1975) 49 Cal.App.3d 343, 354, 122 Cal.Rptr. 701 ["a declaration against penal interest must be `distinctly' against the declarant's penal interest"].)
Under the rule of Leach, a hearsay statement "which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible." (In re Larry C. (1982) 134 Cal.App.3d 62, 69, 184 Cal.Rptr. 505; see People v. Coble, supra, 65 Cal.App.3d at p. 191, 135 Cal.Rptr. 199.)
Pursuant to the foregoing principles, only those portions of Morris's statements that were "specifically disserving" (Leach, supra, 15 Cal.3d at p. 441, 124 Cal.Rptr. 752, 541 P.2d 296) to his penal interests were admissible under section 1230. Therefore, in redacting Morris's statements, the court should have excised "any statement or portion of a statement" (Leach, supra, at p. 441, 124 Cal.Rptr. 752, 541 P.2d 296) that was not specifically disserving to Morris.
*708 The record reveals that the redacted version of Morris's statements related by Sergeant O'Hanlon, while perhaps less exculpatory of Morris than an unredacted version would have been, nevertheless retained a number of statements that, far from "specifically disserving" Morris's penal interests, positively served those interests.
Sergeant O'Hanlon testified, for example, that Morris, while admitting he had committed a drive-by shooting, stated he shot "at the wrong house" and that he did the shooting "in retaliation for an earlier shooting." Pressed, Morris explained "that he saw on TV that a lady had been shot in the leg, and that he realized then it had been the wrong house" and that he had intended to shoot "the house of a guy who had done a drive-by shooting in the past." Morris also said that he had used a Tec-9 gun, but that a clip police found in his apartment "wasn't the one used in the shooting."
Most significantly, Sergeant O'Hanlon testified as follows:
"Q. What, if anything, did Mr. Morris tell you about the shooting?
"A. He said that he had shot at the wrong house. He actually went by the house twice, but then he shot at the house, because he saw a light on in the front window. He also said he didn't want to kill anybody, or take a chance of hurting anybody, so he shot high, at the roof."
Thus, among the hearsay declarations admitted against defendant were statements and portions of statements that suggested Morris only by mistake (repeated reference to "the wrong house") participated in the shooting of the Sullivan residence and, hence, contributed to any injuries suffered by its occupants. Admitted also were statements and portions of statements that tended to cast a more sympathetic light on Morris's motives ("retaliation for an earlier shooting") and intentions ("he didn't want to kill anybody" or even "take a chance of hurting anybody") than authorities or a jury might otherwise perceive. Most significantly, especially in light of other evidence revealing that Morris was not the only shooter and that Ms. Sullivan was struck by a bullet (which facts Morris, at the time of his statements, knew from having been present and from the news reports he mentioned), the court admitted Morris's statements suggesting that Morrisbecause, assertedly, he "shot high, at the roofwas not the shooter responsible for injuring Ms. Sullivan and endangering her children.
We conclude that these portions of Morris's statements cannot, considered either on their own or in their net effect with other evidence, properly be characterized as "specifically disserving" (Leach, supra, 15 Cal.3d at p. 441, 124 Cal.Rptr. 752, 541 P.2d 296) of Morris's penal interests. Rather, they tended sympathetically to describe Morris's participation in the shooting of the Sullivan residence, to minimize his responsibility for the injuries caused thereby and to imply that others who were or might become implicated should bear a greater share of the responsibility.[2] As the statements were not specifically disserving to Morris, the trial court erred in admitting them into evidence against defendant.

2. Indicia of trustworthiness
While redaction, when properly employed, can help ensure that only the "specifically disserving" (Leach, supra, 15 Cal.3d at p. 441, 124 Cal.Rptr. 752, 541 P.2d 296) and, hence, most reliable, portions *709 of a particular hearsay declaration are actually admitted into evidence, redaction cannot enhance the underlying or general trustworthiness of a declaration as a whole. By its nature an after-the-fact process employed with respect to a previously existing declaration, redaction as a logical matter simply cannot bear on, let alone alter, the declarant's motives or any other circumstance that might affect a given declaration's fundamental reliability and inform a court's assessment thereof.
Thus, even when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. (See People v. Shipe, supra, 49 Cal.App.3d at p. 354, 122 Cal.Rptr. 701 [to satisfy the requirements of § 1230, a declaration must be distinctly against the declarant's penal interest "and must be clothed with indicia of reliability"]; see generally 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, §§ 150, 151, pp. 861-864 [same].)
"To determine whether [a particular] declaration [against penal interest] passes [section 1230's] required threshold of trustworthiness, a trial court `may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (People v. Cudjo (1993) 6 Cal.4th 585, 607, 25 Cal.Rptr.2d 390, 863 P.2d 635.) We have recognized that, in this context, assessing trustworthiness "`requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.'" (People v. Frierson (1991) 53 Cal.3d 730, 745, 280 Cal.Rptr. 440, 808 P.2d 1197.)
Several factors persuade us that, redaction aside, Billy Morris's postarrest statements implicating defendant, in light of the circumstances under which they were uttered and the possible motivation of the declarant (People v. Frierson, supra, 53 Cal.3d at p. 745, 280 Cal.Rptr. 440, 808 P.2d 1197), simply were not "sufficiently reliable to warrant admission despite [their] hearsay character" (People v. Cudjo, supra, 6 Cal.4th at p. 607, 25 Cal. Rptr.2d 390, 863 P.2d 635).
First, examination of the full, unredacted version of Morris's postarrest statements implicating defendant reveals that, however incriminating of Morris himself the statements may in a general sense have been, they unmistakably also were "attempts to shift blame or curry favor" (Williamson v. United States, supra, 512 U.S. at p. 603, 114 S.Ct. 2431) with the authorities.[3]
As defendant points out, in his unredacted postarrest statements to Sergeant O'Hanlon, Morris claimed that the idea of doing the drive-by shooting was not his, but his "friend's," i.e., "Danny[`s]," and that the motive was retaliatory; the idea "came up because . .. Danny, was telling me that some guy, you know, was all trying to shoot him" in a earlier drive-by shooting that had occurred within the previous month. Morris asserted that Danny had "problems with this guy for a long time" and that "this guy" was a gang member. Morris claimed he had "no idea" how the guns for the shooting had been obtained, that he had no firearms training and that he was not a marksman. Morris further claimed that, while Danny had the idea for the shooting and, having been goaded, "thought he had to prove himself," Morris himself had just been drunk. In *710 fact, as defendant points out, Morris claimed he had been very drunk because he had consumed a great deal of 151-proof rum.
Morris blamed the targeting of the Sullivan residence on "wrong directions" given by a "[s]tupid idiot at the time," "[s]ome Mexican guy" who drove the car and persuaded Morris and Danny, over Morris's doubts, into believing the Sullivan house was the residence of the gang member who previously had shot at Danny. According to Morris, he and Danny "didn't want to hurt anybody that was innocent," but the person who was supposed to point out where the gang member lived "deliberately gave us the wrong house on purpose."
In describing the shooting itself, Morris stated that Danny's shots did not sound like they were automatic and that Danny used an assault rifle, pulling the trigger "one at a time." For his own part, Morris (as noted earlier) claimed, "I didn't, didn't want to kill nobody. I didn't want to take that chance of hurting anyone, so I didn't fire directly, you know, I fired from a point to where nobody can get hurtat the roof." After the shooting, according to Morris, he and Danny sat and talked about their "[h]ope that we got the right house." In fact, neither in the police car at the time of his arrest nor at the police station thereafter did Morris utter a single simple statement confirming his own culpability without alluding to the culpability of others or to circumstances he apparently thought might elicit sympathy or be considered mitigating.
Morris's statement that he fired at the roof plainly implied that "Danny"as the only other shooterwas the person who actually wounded Ms. Sullivan.[4] Moreover, having identified "Danny" as the originator of the shooting plan and the one who shot the assault rifle, Morris also provided information sufficient to enable the authorities to confirm that defendant was the "Danny" of whom he spoke. Morris at one point pretended not to know defendant's name, but assented when specifically asked if "Danny" was indeed the name of the person he earlier had identified as having had the idea of the shooting and if Danny's name and telephone number could be found on lists police had found in Morris's apartment. At another point, Morris noted he knew "a couple" of Dannys and asserted (after Sergeant O'Hanlon gave defendant's full name and suggested he rode a bicycle) that "it isn't the same guy." However, after confirming that "this thing ain't gonna come out that I told you anything about Danny," Morris identified the "one Danny that I'm talking about" as coming from Los Angeles, driving a motorcycle and attending both Conejo Valley Continuation High School and a night school in Thousand Oaks. Morris also claimed "one of his [i.e., Danny's] friends" retrieved the weapons used in the shooting from the ditch where he and Danny had discarded them on the night of the crime.
Thus, from start to finish, in his postarrest statements to Sergeant O'Hanlon, Morris evidently was "trying to fasten guilt" on others, including defendant, while "keeping his own skirts as clean as possible" (People v. Coble, supra, 65 Cal.App.3d at p. 191, 135 Cal.Rptr. 199) under the circumstances.
The People concede that Morris's statements that he did not want to kill or hurt anyone "do not, upon initial review, appear disserving." However, the People suggest, they demonstrate Morris was attempting *711 to explain his criminal action and are disserving to the extent they acknowledge he was involved in the criminal act. Perhaps so, but such would be true of any attempt to "shift blame" (Williamson v. United States, supra, 512 U.S. at p. 603, 114 S.Ct. 2431) without completely denying involvement. The People's attempt in their briefing to parse Morris's postarrest statements to isolate portions that facially incriminate him misses the point, as it runs contrary to the principles both of Leach, supra, 15 Cal.3d 419, 124 Cal.Rptr. 752, 541 P.2d 296, where we recognized that collateral statements are not made trustworthy by proximity to incriminating statements, and Williamson v. United States, supra, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476, where the high court stated that whether a statement is truly self-inculpatory can only be determined by viewing it in context.
Second, Morris's statements implicating defendant were made to police shortly after he had been apprehended, arrested, and taken into custody. Thus, they were "made in the coercive atmosphere of official interrogation." (Dutton v. Evans (1970) 400 U.S. 74, 87, 91 S.Ct. 210, 27 L.Ed.2d 213.)
The police officer who arrested Morris initially indicated that the authorities already knew what had happened and who was involved, and that police were in the process of serving warrants at the residences of Morris's friends. The officer further suggested that if Morris cooperated he might avoid spending the rest of his life in jail. In addition, Morris knew that physical evidence linking him to the crime was discovered when the police searched his residence. Under these circumstances, Morris may have believed that the police had sufficient evidence to link him to the crimes, and that he had little to lose and perhaps something to gain by admitting his role while attempting to minimize his participation and shift primary responsibility to others. Eventually, as discussed, Morris provided sufficient information to identify defendant as the other shooter who first had the idea to attack the residence and who likely fired the bullet injuring Ms. Sullivan. The transcript of Morris's confession suggests that Morris actually identified a photograph of defendant. Morris also claimed that the physical evidence discovered at his residence was left there by defendant the morning after the shooting.
As we previously have observed, there is a "vast difference between an informant who comes in off the street to confess complicity in a crime and identify his confederate, and one who, caught with inculpatory evidence, identifies someone else as the principal culprit, [¶] Information received from sources who are themselves the focus of pending criminal charges or investigations is inherently suspect. `All familiar with law enforcement know that the tips they provide may reflect their vulnerability to police pressure or may involve revenge, braggadocio, self-exculpation, or the hope of compensation.'" (People v. Campa, supra, 36 Cal.3d at p. 882, 206 Cal.Rptr. 114, 686 P.2d 634.)
The People suggest that because Morris's postarrest statements were redacted to delete express references to anyone except Morris, "the inference drawn from custodial questioning [i.e., that it tends to elicit unreliable answers] should be neutralized." As previously discussed, however, redaction by its nature cannot add to a statement's circumstantial trustworthiness. This is not to say that a well-redacted statement in a future case inevitably should be excluded as untrustworthy merely because the original unredacted statement was custodial or contains some self-serving remarks. Courts applying section 1230 to determine the basic trustworthiness of a proffered declaration are, rather, to "consider all the surrounding circumstances to determine if a reasonable person in [the declarant's] position would have made the statements if they weren't true." (People v. Rios (1985) 163 Cal. App.3d 852, 867, 210 Cal.Rptr. 271.)
*712 Our concurring and dissenting colleagues deem only "minor" (cone. & dis. opn., post, 101 Cal.Rptr.2d at p. 715, 12 P.3d at p. 1122) the exculpatory aspects of the hearsay that was admitted against defendant. As we have explained in detail, we do not share that assessment. Accordingly, we disagree our holding will cause courts in future cases "to exclude most police confessions by nontestifying accomplices out of hand, even those portions so clearly and strictly self-incriminatory when uttered that they are almost certain to be true" (id. at p. 717, 12 P.3d at p. 1124, italics in original).
We have observed that the entire rationale underlying the against penal interest hearsay exception "breaks down in a situation where a declarant in police custody seeks to exculpate himself by implicating another suspect." (People v. Campa, supra, 36 Cal.3d at p. 882, 206 Cal.Rptr. 114, 686 P.2d 634; see also People v. Shipe, supra, 49 Cal.App.3d at p. 354, 122 Cal. Rptr. 701 [postarrest statement admitting some complicity but ascribing greater culpability to coparticipant lacks indicia of reliability].)
For these reasons, we conclude that, as a matter of state evidentiary law, the trial court erred in admitting into evidence Sergeant O'Hanlon's testimony relating Morris's postarrest statements implicating defendant. Morris's statements, even as redacted, contained assertions that were not themselves "specifically disserving to the interests of the declarant" (Leach, supra, 15 Cal.3d at p. 441, 124 Cal.Rptr. 752, 541 P.2d 296) and, redaction aside, lacked sufficient indicia of trustworthiness (People v. Cudjo, supra, 6 Cal.4th at p. 607, 25 Cal.Rptr.2d 390, 863 P.2d 635) to qualify for admission under section 1230's exception to the hearsay rule.

B. Prejudice
Because the prosecution's case depended so heavily on the unreliable and impeached testimony of Eran Knoxfor the corroboration of which Morris's hear-say statements ostensibly were introducedwe also conclude that the court's error in applying section 1230 cannot be dismissed as harmless under People v. Watson (1956) 46 Cal.2d 818, 836-837, 299 P.2d 243, the standard applicable to state law error in the admission of hearsay. (See People v. Reed (1996) 13 Cal.4th 217, 231, 52 Cal.Rptr.2d 106, 914 P.2d 184; People v. Rodrigues (1994) 8 Cal.4th 1060, 1121-1122, 36 Cal.Rptr.2d 235, 885 P.2d 1; Leach, supra, 15 Cal.3d at p. 445, 124 Cal.Rptr. 752, 541 P.2d 296.)
As the Court of Appeal noted, several jurors in defendant's first trial, which ended in a hung jury, expressed concern about the reliability of Knox's testimony after it was impeached by the defense with his prior inconsistent statements. At defendant's second trial, the jury twice during deliberations inquired about Morris's statements and once about Knox's testimony.
Without Morris's hearsay statements, the prosecution's case against defendant was exceedingly weak. No physical evidence tied defendant to the Sullivan residence, nor did he make any incriminating statements. Defendant's roommate, Scott Ramirez, testified that he saw and heard defendant at their joint residence near the time of the shooting. He also testified that, although he had lived with defendant for more than two years, he had never seen an SKS assault weapon or a Tec-9 pistol in defendant's room or in the house they shared. The only evidence directly implicating defendant was Knox's testimony, which in many aspects was impeached.
For example, Michael McKendry, a senior investigator for the district attorney in Ventura County, testified for the People that, in an interview, Knox told him that he and his brother Eric together "slim jimmed" (i.e., broke into; see, ante, fn. 1) Billy Morris's automobile at Borchard Park on the night of the shooting, but the parties subsequently stipulated that Eric Knox, if called, would testify that it was on *713 an entirely different night that his brother telephoned him to come to the park and do the slim jimming. Investigator McKendry testified in detail, moreover, regarding numerous incomplete and conflicting statements that Knox had made about the events in question. Even the prosecutor stated, "I grant Eran [Knox]'s testimony requires corroboration" and, while attempting to minimize their impact, acknowledged Knox "did make inconsistent statements."
In light of the foregoing, especially the absence of an eyewitness to the shooting, the lack of physical evidence linking defendant to the crime, and the serious impeachment of Eran Knox, upon whose testimony the People's case primarily depended, we conclude it is "reasonably probable that a result more favorable to defendant would have been reached" (People v. Watson, supra, 46 Cal.2d at p. 837, 299 P.2d 243) had not the trial court erred by admitting Sergeant O'Hanlon's testimony relating Morris's self-serving and unreliable hearsay statements.
Although the parties do not dispute that the trial court's admission of Morris's declaration at defendant's trial implicates the Sixth Amendment, because we have determined under state evidentiary law that the trial court erred prejudicially, we decline to address defendant's constitutional claim.

Disposition
For the foregoing reasons, we affirm the judgment of the Court of Appeal.
GEORGE, C.J., MOSK, J., and BROWN, J., concur.
Concurring Opinion by CHIN, J.
I concur in affirming the judgment of the Court of Appeal, because I believe that admitting Morris's poorly redacted postarrest statement was improper and prejudiced defendant by implying that he (being the only other person involved in the shooting) was the person who wounded Ms. Sullivan.
I write separately only because I am troubled by certain broad language in the majority opinion that could be construed as suggesting that even a properly redacted accomplice statement nonetheless should be excluded because "redaction cannot enhance the underlying or general trustworthiness of a declaration as a whole" (maj. opn., ante, 101 Cal.Rptr.2d at p. 709, 12 P.3d at p. 1117), a self-serving accomplice statement may "lack sufficient indicia of trustworthiness" despite redaction of the self-serving matter (ibid.), and statements made in custody are inherently untrustworthy, occurring in the "`coercive atmosphere of official interrogation'" (id, at p. 711, 12 P.3d at 1119).
I tend to agree with Justice Baxter "that if collateral and self-exculpatory elements of a statement can be separated and redacted, such that no flavor of false self-justification or blame-shifting remains, the strictly self-incriminatory portions may be admitted as trustworthy under the penal-interest exception to the hearsay rule. [Citations.]" (Cone. & dis. opn, post, 101 Cal.Rptr.2d at p. 717, 12 P.3d at p. 1124.)
Concurring and Dissenting Opinion by BAXTER, J.
Minor portions of William Morris's interview in police custody, even as redacted for use at trial, may have been improperly admitted against defendant under the penal-interest exception to California's hearsay rule (Evid.Code, § 1230), because they were not "specifically disserving" to the nontestifying Morris himself and thus lacked sufficient indicia of reliability. (People v. Leach (1975) 15 Cal.3d 419, 441, 124 Cal.Rptr. 752, 541 P.2d 296 (Leach).) If so, admission of these same fragments may also have violated the Sixth Amendment's confrontation clause, because they neither fell within a "firmly rooted" hearsay exception nor otherwise exhibited "particularized guarantees of trustworthiness" *714 sufficient to dispense with cross-examination. (E.g., Lilly v. Virginia (1999) 527 U.S. 116, 124-125, 119 S.Ct. 1887, 144 L.Ed.2d 117 (plur.opn.) (Lilly); Ohio v. Roberts (1980) 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597.) However, I believe any error in the admission of these isolated segments was harmless by any applicable standard. Contrary to the majority, I would therefore reverse the judgment of the Court of Appeal and uphold defendant's convictions.
I disagree vigorously with the majority's broader conclusion that Morris's statement was inadmissible in any form. The majority reason that even if Morris made some admissions strictly against his penal interest, his entire statement, including those portions incriminating only to Morris himself, is nonetheless disqualified as unreliable under the Evidence Code because the statement was given in police custody, identified coparticipants, and included Morris's efforts to present himself in a sympathetic light. On the contrary, I conclude Morris's basic description of his participation in a drive-by shooting at a particular time and place, as properly redacted to eliminate any hint of self-justification, blame shifting, or incrimination of others, is amply trustworthy. Its admission in that form would satisfy both the letter and the spirit of the Evidence Code, and of the confrontation clause as well. By attacking Morris's statement with a chain saw instead of a scalpel, the majority wrongly deprive the People of a reliable and important link in the circumstantial chain of proof that defendant committed the serious crimes charged against him. From this aspect of the majority's analysis, I therefore dissent.
At the outset, as the majority must concede, major efforts were made to remove all objectionable features from the version of Morris's statement the jury heard. In this version, as briefly presented by Sergeant O'Hanlon, Morris appears to speak in the first person singular and to describe himself as acting alone. Throughout the entire statement, as redacted for trial, there is no suggestion that others were involved. In O'Hanlon's redacted version, Morris candidly explained that "he [i.e., Morris] decided to go do a drive by [shooting]" in retaliation against "a guy who had done a drive by shooting in the past. He [i.e., Morris] armed himself and left [Borchard Park] in his car." (Italics added.) According to O'Hanlon, Morris described the house where the shooting occurred (a one-story blue house in Newbury Park with a basketball hoop in front), the weapon "[h]e used" (a Tec-9 pistol with a "long clip"), the number of shots "he fired" ("about 30" in semiautomatic mode), and what "he" did after the shooting (went back to Borchard Park, then returned home). (Italics added.) The prosecutor asked O'Hanlon whether Morris had said anything about the role of Eran Knox, the chief (Prosecution witness, in the shooting. O'Hanlon replied Morris had explained that "Eran remained in the park when he [i.e., Morris] left to do the drive by, and that Eran had tried to talk him [i.e., Morris] out of doing the shooting." (Italics added.)
These statements all appear specifically disserving to Morris by describing, without elaboration, his own active participation in a serious criminal enterprise. They reveal, in and of themselves, no effort by Morris to curry favor, minimize his personal culpability, identify accomplices, or shift the principal blame to others. Indeed, in redacted form, they impliedly overstate Morris's complicity by insinuating that he himself was the instigator of the incident, and that, having decided to act, he could not be dissuaded by Knox, who did not participate in the shooting. As to the basic events of the incident, and Morris's role therein, these statements so far incriminated rather than favored or exculpated Morris that "a reasonable [person] in [Morris's] position would not have made [them] unless he believed [them] to be *715 true." (Evid.Code, § 1230.)[1] Hence, they were properly admissible under the statutory exception to California's hearsay rule. For the same reason, I believe, they exhibited particularized guarantees of trustworthiness sufficient to satisfy the confrontation clause. (See, e.g., Lilly, supra, 527 U.S. 116, 124-125, 119 S.Ct. 1887, 144 L.Ed.2d 117.)
Arguably the redacted statement, as admitted in court, should not have included Morris's insistence that he fired high, at the roof, to avoid hurting anyone. Nor, perhaps, should the jury have heard Morris's claim that when he learned from television a lady had been wounded in the leg, he realized he had shot at the wrong house. These particular remarks might be viewed as attempts by Morris to portray his actions and intentions as sympathetically as possible. Seen in that light, they are not presumptively trustworthy as specifically disserving to Morris's penal interest, and are thus not within the narrow hearsay exception provided by the Evidence Code. For similar reasons, and to the same limited extent, a violation of the confrontation clause also may have occurred.
But I fail to see any possibility of prejudice from these minor lapses. They cast no aspersions on defendant, and they were collateral to defendant's guilt or innocence of the charged crimes. That Morris disclaimed an intent to kill or injure anyone, and expressed regret for shooting at the wrong (rather than the "right") house, in no way insinuates that defendant, whose participation and role were excised from Morris's redacted statement, felt or acted more culpably.[2]
The majority insist that by erroneously including Morris's claim "he" fired high to avoid injuring the house's occupants, the redacted statement prejudiced defendant by implying, in context, that defendant did not fire high, and that defendant's bullet must therefore have struck Ms. Sullivan. This theory is speculative in the extreme. As the jury heard, Morris admitted he intentionally discharged some 30 bullets at a private residence, having reason to believe, because "he saw a light on in a front window," that the house was then occupied. His shots were fired from the window of a car on the street in front of the residence. Even if Morris hoped otherwise, no rational inference arises that Morris was successful in directing this profligate and indiscriminate attack away from inhabited areas of the target residence, and that the injurious bullet must thus have been fired by someone else.
Nor, as indicated above, does the redacted statement imply that defendant, to whom all reference was omitted, acted differently from Morris, and, unlike Morris, took intentional aim at areas where people were likely to be injured.[3] The prosecutor *716 made no attempt to exploit these aspects of Morris's statement to argue that defendant was the one who wounded Ms. Sullivan.
The prosecution did seek to link defendant to the injurious bullet. Moreover, the prosecution's theory depended by inference on another portion of Morris's statement as heard by the jury, i.e., Morris's disclosure that he used a nine-millimeter machine pistol, a Tec-9, in the assault. Other evidence suggested that the bullet which most likely wounded Ms. Sullivan came from a 7.62-millimeter assault rifle. The prosecutor urged, by process of elimination, that if Morris used the Tec-9, defendant must have fired the 7.62-millimeter weapon.
However, I see no basis for reversal in these facts, for I am convinced Morris's Tec-9 statement was presumptively reliable and thus admissible. In referring to the Tec-9, Morris was simply describing, without self-justification or blame shifting, the weapon he himself used to fire "about 30" shots at the Sullivan home. The reference appears specifically disserving to Morris, and thus likely truthful. There is no indication that the reference was self-exculpatory in context, and thus might be a lie. (See, e.g., Williamson v. United States (1994) 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (Williamson).) Specifically, the record discloses no evidence that, at the time Morris made the Tec-9 statement, he had any reason to believe, or thought the police believed, the bullet which struck Ms. Sullivan came from any other weapon. Hence, there is no basis to infer that by identifying his own weapon as a Tec-9, Morris sought to curry favor or shift blame.[4]
For these reasons, I am persuaded that any improperly admitted excerpts from Morris's police statement caused no prejudice to defendant. (See Chapman v. California (1967) 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705; People v. Watson (1956) 46 Cal.2d XXX-XXX-XXX, 299 P.2d 243.) I would therefore uphold defendant's convictions, and would overturn the reversal entered by the Court of Appeal.
But the majority's analysis contains a far more serious flaw. The majority alternatively hold that defendant was prejudiced because no part of Morris's police statement was properly admissible. This is so, the majority insist, because Morris's statement occurred in police custody, with a motive to curry favor and shift blame, and included such self-exculpatory efforts. Hence, the majority conclude, even those portions of Morris's statement that were specifically and solely self-incriminatory are not trustworthy enough to allow their hearsay use against defendant. I am not persuaded.
Many cases confirm that statements, particularly those made in circumstances *717 where there is a motive to shade or distort the truth, are not necessarily credible, and thus admissible, as a whole simply because they include admissions of criminal culpability. (E.g., People v. Campa (1984) 36 Cal.3d. 870, 883, 206 Cal.Rptr. 114, 686 P.2d 634.) It is certainly true that "`a self-serving statement lacks trustworthiness whether it accompanies a disserving statement or not.'" (Leach, supra, 15 Cal.3d 419, 439, fn. 15, 124 Cal.Rptr. 752, 541 P.2d 296, quoting Jefferson, Declarations Against Interest: An Exception to the Hearsay Rule (1944) 58 Harv. L.Rev. 1, 60, italics added.) And context may reveal that a particular statement, though self-incriminatory on its face, actually has exculpatory meaning or purpose which undermines its trustworthiness. (E.g., Williamson, supra, 512 U.S. 594, 603-604, 114 S.Ct. 2431, 129 L.Ed.2d 476; People v. Coble (1976) 65 Cal.App.3d 187, 191,135 Cal.Rptr. 199 (Coble).)
Hence, it has long been settled in California that the hearsay exception for declarations against penal interest does not apply to "collateral assertions within declarations against penal interest." (Leach, supra, 15 Cal.3d 419, 439, 124 Cal.Rptr. 752, 541 P.2d 296, italics added.) If, for example, a statement, whether to the police or others, admits the declarant's culpability only in the context of limiting it, as by expressly or impliedly shifting major blame to others, it is inadmissible to that extent. (E.g., Coble, supra, 65 Cal.App.3d 187, 191, 135 Cal.Rptr. 199; see People v. Bullard (1977) 75 Cal.App.3d 764, 770, 142 Cal.Rptr. 473 ["inseparable combination of exculpatory and inculpatory matter"].) Only those portions of a hearsay statement that are "specifically disserving" to the declarant (Leach, supra, at p. 441, 124 Cal.Rptr. 752, 541 P.2d 296), i.e., "`distinctly' against the declarant's penal interest" (People v. Shipe (1975) 49 Cal.App.3d 343, 354, 122 Cal.Rptr. 701), and thus presumptively trustworthy, may be admitted.
But the majority turn these truisms on their heads. They hold, contrary to logic, that even if particular utterances were strictly disserving to the declarant when made and can easily be isolated from collateral or exculpatory aspects of the declarant's statement, the self-incriminatory utterances are still not trustworthy, and thus are not admissible as hearsay in an accomplice's separate trial, if they were accompanied by self-serving statements and were made under circumstances suggesting some general motive to lie or distort. The majority thus throw out the baby with the bathwater. The effect of the majority's rule is to exclude most police confessions by nontestifying accomplices out of hand, even those portions so clearly and strictly self-incriminatory when uttered that they are almost certain to be true.
The majority cite no decision, and I am aware of none, that requires such a result. On the contrary, the law has assumed, at a minimum, that if collateral and self-exculpatory elements of a statement can be separated and redacted, such that no flavor of false self-justification or blame shifting remains, the strictly self-incriminatory portions may be admitted as trustworthy under the penal-interest exception to the hearsay rule. (See, e.g., Leach, supra, 15 Cal.3d 419, 439-441, 124 Cal.Rptr. 752, 541 P.2d 296; Williamson, supra, 512 U.S. 594, 598-604, 114 S.Ct. 2431, 129 L.Ed.2d 476 (plur. opn. of O'Connor, J.); id. at pp. 605-606, 114 S.Ct. 2431 (cone. opn. of Scalia, J.); id. at pp. 611-621, 114 S.Ct. 2431 (cone. opn. of Kennedy, J.) [construing federal penal-interest rule].)
Similarly, because of the motive to shift blame falsely, and the consequent need to cross-examine the accuser, the Sixth Amendment's confrontation clause may most often prohibit the use against an accused of directly incriminating statements against him that were made by a nontestifying accomplice while in police custody. (See, e.g., Lilly, supra, 527 U.S. 116, 130-139, 119 S.Ct. 1887, 144 L.Ed.2d 117 (plur. opn. of Stevens, J.); id. at p. 143, 119 S.Ct. 1887 (conc. opn. of Scalia, *718 J.); Lee v. Illinois (1986) 476 U.S. 530, 539-547, 106 S.Ct 2056, 90 L.Ed.2d 514; Douglas v. Alabama (1965) 380 U.S. 415, 418-420, 85 S.Ct. 1074, 13 L.Ed.2d 934; cf. Bruton v. United States (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476.) But again, similar suspicions do not logically attach to those portions of such a statement that were strictly self-incriminatory, even where, apart from any motive of the accomplice to shift blame or incriminate others, the accomplice's admission of his own participation may form an indirect or circumstantial link in the chain of evidence against the defendant. (Cf. Williamson, supra, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476; Richardson v. Marsh (1987) 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176.)
Though Morris made some effort to present his case sympathetically to the authorities, his police statement also included candid admissions of his own substantial participation in a drive-by shooting at a particular time and place. For purposes of defendant's trial, these self-incriminatory disclosures could easily be separated from any collateral and self-exculpatory elements of Morris's statement. If properly redacted, I believe Morris's statement was admissible' against defendant under both statutory and constitutional principles. The actual redaction here may not have been strict enough, and defendant's jury may have heard a bit too much. I find any such lapses harmless, however, and I would therefore reverse the judgment of the Court of Appeal. But even if I agreed with the majority that prejudice arose from an insufficient redaction, I would not deprive the People of all opportunity to use Morris's statement, as properly limited, in any retrial.
KENNARD, J., concurs.
NOTES
[1] A "slim jim" is a tool for breaking into locked vehicles. (See Pen.Code, § 466; People v. Fuhrman (1997) 16 Cal.4th 930, 935, 67 Cal.Rptr.2d 1, 941 P.2d 1189.)
[2] Indeed, the prosecutor in closing argued the evidence in just such fashion: "And you know there were two guns used. Because one was an assault rifle, a SKS assault rifle or at least a 7.62 weapon, and the other was a nine millimeter weapon, [¶] And Billy [Morris] confessed, and said he shot the Tec-9. Well, somebody shot that SKS, ladies and gentlemen. And Eran Knox told you it was Danny Duarte's idea, that he was the one that instigated this conspiracy."
[3] The unredacted transcripts of Sergeant O'Hanlon's postarrest interviews with Morris were offered, and marked, for admission into evidence at trial. As the record on appeal already includes "any exhibit admitted in evidence or rejected" (Cal. Rules of Court, rule 33(a)(3)), it is unnecessary that we grant, and so we deny, the People's request for judicial notice of these materials.
[4] The People argue that Morris's statement does not, as defendant claims, imply that defendant actually wounded Sullivan, but, rather, that it was not the intent of the shooters to injure anyone. Granted that Morris sometimes used the plural pronoun in his self-serving remarks, we nevertheless conclude that neither Sergeant O'Hanlon's phrase that "he [i.e., Morris] shot high, at the roof," the redacted version that was admitted into evidence at trial, nor Morris's actual phrase, "I fired from a point to where nobody can get hurtat the roof," the unredacted version, can reasonably be interpreted as exculpatory of defendant or, indeed, anyone except Morris.
[1] Circumstances may occasionally arise in which even a strictly and narrowly self-damning statement lacks sufficient indicia of trustworthiness to be admitted under the penal-interest exception. (See, e.g., People v. Frierson (1991) 53 Cal.3d 730, 744-746, 280 Cal. Rptr. 440, 808 P.2d 1197 [no abuse of discretion in rejecting defense hearsay evidence of third party's admission he committed the charged murder, where admission was made to defense investigator long after defendant was judged guilty, and likely motive was to help defendant with little personal risk].) But insofar as Morris, in police custody and facing criminal prosecution, admitted his participation in a drive-by shooting, his admissions exhibit patent indicia of reliability.
[2] The jury seems at least as likely to draw the contrary inference, i.e., that if defendant was also involved in the shooting, for similar reasons, he also sought to avoid injury to anyone, or at least anyone other than the intended target. Such an inference would be accurate in light of Morris's unredacted statement, which indicated that "we didn't want to hurt anybody that was innocent," that "we" relied on the directions of a third participant, but that the group drove by the house twice because "we wanted to be sure" it was the right house. (Italics added.)
[3] Again, the jury was at least as likely to assume defendant acted similarly to Morris, and Morris's unredacted statement confirms that view. As noted above, Morris actually spoke in the plural voice when disclaiming intent to injure innocent persons, and, for the most part, he insisted that "we" aimed high to avoid such injury. According to Morris, "we" weren't sure it was the right house, and (apparently referring to the physical pattern of bullet holes he assumed the police had found) "that's why the bullets were high." (Italics added.) Confronted with O'Hanlon's comment that "[u]nfortunately, [they were] not high enough," Morris could only answer, "Yeah." It is true that at one point, O'Hanlon pointedly asked Morris whether "you both aim[ed] high," and Morris responded, "I don't know if he [i.e., defendant] did or not." But if this was an implied accusation of defendant, the jury never heard it.
[4] Nothing in the full transcript of Morris's November 23, 1994, interview at the East Valley sheriff's station indicates Morris was told anything about a specific type or caliber of bullet that struck the victim. At trial, Sergeant O'Hanlon testified he had a brief earlier conversation with Morris, in a police car, just after Morris's arrest. After reading Morris his rights, O'Hanlon asked whether, having these rights in mind, Morris wished to talk about what happened. Morris replied "that he understood his rights, but that he didn't understand the situation," whereupon O'Hanlon "explained the situation to him" and Morris asked if he could talk to O'Hanlon "later" at the station. Nothing in this exchange indicates O'Hanlon apprised Morris of such details as the type of weapon that fired the injurious bullet.