Filed 3/11/14  P. v. Ibarra CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ROBERT QUINONEZ IBARRA,<br><br>    Defendant and Appellant. | 2d Crim. No. B243065<br>(Super. Ct. No. 1200303)<br>(Santa Barbara County) |

Robert Quinonez Ibarra appeals a judgment after conviction by jury of first degree murder with the special circumstance of lying in wait.  (Pen. Code, § 190.2, subd. (a)(15).)  The jury found true allegations that Ibarra personally used a knife and committed the crime for the benefit of a street gang.  (*Id.*, §§ 12022, subd. (b)(1), 186.22, subd. (b)(1).)  The prosecutor did not seek the death penalty.  The trial court sentenced Ibarra to life in prison without the possibility of parole.

In an earlier proceeding, Joshua Miracle was convicted of the same crime and sentenced to death.  After Miracle's conviction, he said that he alone was responsible for the murder and that Ibarra was innocent.  He refused to testify in Ibarra's trial and the trial court excluded his out-of-court statements.

Ibarra contends that the trial court should have admitted Miracle's statements because they were against his penal interest.  (Evid. Code, § 1230.)  Ibarra also contends a detective unfairly buttressed the testimony of an adverse witness when he

said the witness had offered to take a lie detector test. He contends the cumulative effect of these errors denied him a fair trial. We modify the judgment to include a mandatory $40 court security assessment (Pen. Code, § 1465.8, subd. (a)(1)) and a mandatory $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). We otherwise affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Elias Silva was stabbed to death in a Goleta apartment early in the morning on October 3, 2004. Ibarra, Miracle, and Robert Galindo were the only people present when Silva was attacked.

Police found Silva's body in the apartment. His body had 48 stab wounds. Ibarra's fingerprints were on a knife on the floor of the apartment. Ibarra's blood was on the outside of the front door. A mixture of Ibarra's and Silva's blood was on Silva's shoe and on a T-shirt in the apartment. Miracle's palm print was on the bathroom counter and on the inside of the front door next to Ibarra's palm print. A large duffle bag with wheels was on the patio. A drop-cloth, a butane torch, a pick ax, and a receipt, among other items, were inside the bag. The receipt was for two drop-cloths and a pair of gloves that had been purchased the night of October 2, 2004, from Home Depot. A Home Depot videotape from that evening showed Ibarra buying gloves and a drop-cloth. Telephone records showed nine phone calls were made from Ibarra's cell phone to Silva's cell phone in the hours before the murder.

Ibarra and Miracle were arrested a day after the murder, while driving Silva's car in San Diego. Ibarra was bleeding from a stab wound in his leg. Silva's blood and Ibarra's blood were on Miracle's shoes and on a pair of gloves in the back seat.

In 2005, Miracle pled guilty to first degree murder and admitted to lying in wait, personally using a knife, and committing the crime for the benefit of a street gang. In 2006, a jury imposed the death penalty.

Ibarra was tried in 2011. Before Ibarra's trial, Galindo pled guilty to voluntary manslaughter and agreed to testify against Ibarra in exchange for a maximum sentence of 11 years in state prison.

2

*Miracle's Pre-Penalty Statement in Court*

At his pre-penalty hearing, Miracle appeared in court and said he had a "statement that [he] prepared." He said, "I'd like to go on record briefly about why I decided to plead guilty . . . . I'm guilty of the murder and Ibarra is not. . . . I'm the only person responsible for the murder of Eli Silva." He said the only reason he pled guilty was "because [he] felt the only honorable thing to do . . . was to take responsibility in terms of Ibarra's case and then make [himself] available to offer exonerating testimony on [Ibarra's] behalf at trial." Miracle said he intended to offer more detail at Ibarra's trial and he did not intend to offer mitigating evidence at his own penalty phase trial.

*Miracle's Statements to Defense Investigators*

After Miracle was sentenced to death, he made several more statements claiming that he alone was guilty of Silva's murder and Ibarra was innocent. The first statement in January 2006 was in the form of written responses to 17 questions that were posed by Ibarra's defense attorney, Robert Duvall, through Miracle's investigator. The resulting document, "Answers for Duval," gives a detailed account of the killing that, if believed, would exonerate Ibarra. According to Miracle, Ibarra was wholly innocent. Ibarra did not help plan the murder and he did not pull Silva into the apartment. Miracle stabbed Ibarra in the leg when Ibarra tried to intervene, and Miracle forced Ibarra to drive away with him in Silva's car.

Miracle next made a statement in June 2006 to Ibarra's investigator, Robert Strong, in an interview at San Quentin. Strong summarized the conversation in a report.

Miracle refused to be interviewed by the prosecution. Upon request of the prosecution, the trial court ordered Miracle to appear for a hearing about his possible trial testimony pursuant to Evidence Code section 402. Miracle asserted his privilege against self-incrimination and refused to testify at Ibarra's trial.

Miracle made another statement in March 2007 to Ibarra's investigator, again claiming that Ibarra was innocent. Strong summarized it in a second report.

3

*Defense Efforts to Admit Miracle's Statements*

Ibarra sought to introduce Miracle's statements to investigators with an "Application to Present a Complete Defense," wherein he asserts they were admissible pursuant to Evidence Code section 1230 (hearsay statement admissible when unavailable witness made it against penal interest in circumstances indicating trustworthiness). The trial court deferred ruling. Toward the end of trial, Ibarra again offered the statements with a "Motion to Admit Evidence as Declaration Against Interest." Both requests were limited to Miracle's statements to investigators. But at the hearing, counsel also offered Miracle's pre-penalty statement and the court included the pre-penalty statement in its ruling.

The trial court excluded Miracle's statements. The court found the statements were not "significantly" against Miracle's penal interest because they were made after he was convicted and were untrustworthy. With respect to Miracle's pre-penalty statement, the trial court found "part of [it] is a declaration against penal interest ['I'm guilty of the murder'], and part of it is collateral to the declaration against penal interest ['Ibarra is not']." With respect to the statements to investigators, the court found the circumstances "suggest that Mr. Miracle is reflective, he's thought about his statements, he's making them to a defense investigator, it seems to me that they lack trustworthiness . . . ."

The trial court said, "[T]hey're not the kind of incriminating statements that are made under circumstances that really expose him to criminal liability having been made two years later to an investigator for a co-participant or a co-defendant seems to suggest that his motivation may have been to protect the co-participants or the co-defendant as opposed to making the statements under circumstances where he was truly exposing himself to criminal liability by making the statements . . . ." The court also excluded a recorded conversation between Miracle and his stepmother in which he said, "[I]f I am willing to kill, I should be willing to die," because it was not exculpatory of Ibarra and it would introduce the issue of penalty. At a subsequent hearing, the court further considered the statements and concluded, "[They were] made with an intent to

4

enhance his reputation, avoid cooperation with law enforcement in any way, assist Mr. Ibarra with whom he had some sort of relationship. It would appear that he has the motivation to--which is obvious in reading his statement that he's going above and beyond any sort of objective recitation of the facts in order to attempt to exculpate Mr. Ibarra. It seems like the totality of circumstances suggests that the statements are untrustworthy, and I'm going to exclude them."

### *Galindo's Testimony*

Galindo testified for several days leading up to the night of October 2, 2004, he, Miracle, and Ibarra were gathered in his apartment. Silva was a methamphetamine dealer. Galindo testified that Miracle and Ibarra had a conversation about "cleaning up the rats in Santa Barbara." Miracle asked Galindo to call Silva and tell him to come to the apartment. When Galindo protested, Miracle held a knife to Galindo's throat. Galindo used Ibarra's cell phone to call Silva many times before he persuaded Silva to come. Before Silva arrived, Miracle and Ibarra brought a duffel bag into the apartment and cleared the furniture from the entrance. Miracle armed himself with a butcher knife. When Silva opened the door, Ibarra pulled Silva into the apartment and Miracle attacked Silva. Galindo testified that he ran from the apartment and did not see Silva get stabbed.

Galindo had Ibarra's cell phone, but he did not call 911. He went to an acquaintance's house where, she testified, he and others coordinated their stories before contacting police. Galindo testified in exchange for leniency. His testimony was inconsistent with his initial statements to police. In a note, a juror asked, "What do/can we do when there are inconsistencies in testimony that the attorneys don't address?" The juror pointed out that phone records contradicted Galindo's testimony. Another juror asked if Galindo had been gainfully employed, pointed out conflicts in his testimony, and wrote, "R.G. has stated this both ways. Which was it?"

### *Reference to Polygraph At Trial*

Sheriff's Detective Christopher Dallenbach described Galindo's October 3 interview. The prosecutor asked Dallenbach whether Galindo offered to be tested for

narcotics. Dallenbach said, "I remember that. I also remember him offering to take a polygraph exam." The trial court sustained defense counsel's objection, struck the testimony, and instructed the jury to disregard the answer. Counsel did not request further admonition. The court denied Ibarra's request for a mistrial.

DISCUSSION

*Statements Against Penal Interest*

The hearsay statement of an unavailable witness may be admitted if, when made, it "subjected him to the risk of . . . criminal liability" such "that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.) The proponent of a statement against penal interest must show that (1) the declarant is unavailable, (2) the declaration was against the declarant's penal interest, and (3) the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) The exception does not apply to collateral assertions within declarations against penal interest. (*People v. Leach, supra,* 15 Cal.3d 419, 441.) Declarations against penal interest may contain self-serving and unreliable information. (*Duarte,* at p. 611.) Only those portions of a statement that are "specifically disserving" to the speaker's penal interest are admissible under Evidence Code section 1230. (*Duarte,* at p. 612.) We review for abuse of discretion a trial court's decision to admit or exclude a statement against penal interest. (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.)

Miracle became unavailable when he invoked the Fifth Amendment. (*People v. Leach* (1975) 15 Cal.3d 419, 438). He made the pre-penalty statement and the statements to investigators after he was convicted. Although the statements could be used against him if his conviction were reversed, the remoteness of this possibility, joined with other circumstances, supports the trial court's determination that Miracle's statements are not sufficiently reliable to warrant admission despite their hearsay character.

To determine whether a statement against penal interest is sufficiently trustworthy to warrant admission, the trial court must consider the totality of the

6

circumstances and may consider (1) not just the words but the circumstances under which they were uttered, (2) the possible motivation of the declarant, and (3) the declarant's relationship to the defendant. (*People v. Duarte, supra,* 24 Cal.4th 603, 614.)

The trial court carefully considered all these factors and reasonably concluded the statements were not reliable. Miracle's pre-penalty statement was a contrived effort to exonerate Ibarra at little risk to his own criminal liability. Miracle described it as a "prepared" statement and asked the court for an opportunity to put it "on the record." He acknowledged that he was motivated to exonerate Ibarra and that his claim of sole responsibility could inspire leniency in the penalty phase of his own trial.

Miracle's statements to defense investigators are even less trustworthy because of the time he had to reflect and construct them and because he had so little to lose after he was sentenced to death. He spent hours preparing the detailed written account "for Duvall." That Miracle's written answers to Duvall's questions were corroborated by physical evidence does not render them trustworthy. As a self-represented litigant, Miracle had access to all of the physical evidence concerning Silva's murder, and he had the time and opportunity to create a coherent account in response to the written questions. The trial court did not abuse its discretion when it excluded Miracle's statements.

### Reference to Polygraph Examination

Ibarra contends that Dallenbach leant Galindo's testimony a prejudicially false aura of credibility that could not be cured by admonition when Dallenbach said Galindo offered to take a polygraph examination. We disagree.

Evidence of an offer to take a polygraph is inadmissible, absent stipulation. (Evid. Code, § 351.1, subd. (a).) A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. (*People v. Dement* (2011) 53 Cal.4th 1, 40.) A witness's volunteered statement may provide the basis for a finding of incurable prejudice. (*Ibid.*) We review the denial of a motion for mistrial under the deferential abuse of discretion standard. (*People v. Cox* (2003) 30 Cal.4th 916, 953 [no incurable prejudice where prosecutor's isolated question about polygraph was stricken

7

before witness could respond], overruled on another ground in *People v Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) The trial court is vested with "considerable discretion" in determining a mistrial motion (*Dement*, at p. 40), because whether a particular incident is incurably prejudicial is "a speculative matter" (*id.* at p. 39).

Dallenbach's reference to a polygraph test was brief. The trial court immediately struck it and admonished the jury: "The last answer that this witness gave is stricken. You're not to consider it at any time either now or during the course of this trial or during deliberations." The trial court acted within its discretion when it concluded the reference was not prejudicial. "[A] trial court's timely admonition, which the jury is presumed to have followed, cures prejudice resulting from the admission of such evidence." (*People v. Cox, supra,* 30 Cal.4th 916, 953, see also *People v. Price* (1991) 1 Cal.4th 324, 428 [witness's brief, nonresponsive claim that he had taken polygraph tests did not lend prejudicially false aura of credibility because it was cured by forceful admonition].) It is true that in *Price* the court specifically admonished the jury that polygraph test results are unreliable and inadmissible, but counsel did not request that specific admonition here. Moreover, the admonition given was sufficient. And counsel engaged in reasonable trial tactics by accepting the trial court's swift admonition and moving on, rather than underscoring the testimony with further comment. This case is unlike *People v. Navarrete* (2010) 181 Cal.App.4th 828, 831-832, in which a mistrial was required after a detective deliberately suggested to the jury that the defendant confessed and the court ruled that "defendant's statement is inadmissible." (*Id.* at p. 831.)

### Cumulative Error

We reject Ibarra's claim of cumulative error. The trial court afforded Ibarra a fair trial. Its approach to the entire proceedings was exemplary.

### Court Security Fee and Criminal Conviction Assessment

The trial court did not impose a $40 court security assessment (Pen. Code, § 1465.8, subd. (a)(1)) or a $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)). The fees are mandatory. (*People v. Rodriguez* (2012) 207 Cal.App.4th 1540, 1543, fn. 2; *People v. Woods* (2010) 191 Cal.App.4th 269, 272.)

8

## DISPOSITION

We modify the judgment to include a $40 court security assessment (Pen. Code, § 1465.8, subd. (a)(1)) and a $30 criminal conviction assessment (Gov. Code, § 70373, subd. (a)(1)), but otherwise affirm. The trial court shall amend the abstract of judgment accordingly and forward it to the Department of Corrections and Rehabilitation.

<u>NOT TO BE PUBLISHED.</u>

GILBERT, P. J.

We concur:

YEGAN, J.

PERREN, J.

9

Brian Hill, Judge

Superior Court County of Santa Barbara

_____

Sanger, Swysen & Dunkle, Robert M. Sanger, Stephen K. Dunkle for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mark A. Kohm, Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.