Filed 12/18/15  P. v. Sanchez and Meza CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H040172 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. Nos. WF01199, WF01196) |
| v. | |
| JOEL SANCHEZ and JOSE MEZA, | |
| Defendants and Appellants. | |

## I.     INTRODUCTION

Codefendants Joel Sanchez and Jose Meza appeal after a jury convicted Sanchez of first degree murder and convicted Meza of second degree murder.  (Pen. Code, § 187, subd. (a).)[1]  The jury also found both defendants guilty of active participation in a criminal street gang.  (§ 186.22, subd. (a).)  As to both defendants, the jury found true the allegation that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)) and the allegation that a principal personally and intentionally discharged a firearm in the commission of the offense (§ 12022.53, subds. (b)-(e)(1)).  The jury did not reach a verdict as to a third codefendant, Angel Torres.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

The trial court sentenced Sanchez to a prison term of 50 years to life, consisting of an indeterminate term of 25 years to life for the first degree murder and an indeterminate term of 25 years to life for the firearm count, with the terms for the gang count and gang allegation stayed. The trial court sentenced Meza to a prison term of 40 years to life, consisting of an indeterminate term of 15 years to life for the second degree murder and an indeterminate term of 25 years to life for the firearm count, with the terms for the gang count and gang allegation stayed.

Defendants' convictions were based on evidence that the murder was committed as part of Meza's initiation into a gang. The prosecution's theory was that Sanchez drove Meza, Torres, and Jose Gonzalez to find a member of a rival gang to shoot, and that Meza and Torres both shot the victim. Both Sanchez and Meza were prosecuted on the theory that they were aiders and abettors of Torres, who fired the lethal shot. Gonzalez testified at trial pursuant to a plea agreement.

On appeal, Sanchez contends: (1) the jury instructions erroneously stated that an aider and abettor could be guilty of first degree murder so long as the direct perpetrator committed a willful, premeditated, and deliberate murder; (2) the trial court erred by refusing to instruct the jury that an aider and abettor may be convicted of a lesser crime than the direct perpetrator; (3) there was insufficient evidence of the "primary activities" element of section 186.22, subdivision (f); (4) inadmissible testimonial hearsay was admitted to prove the "pattern of criminal gang activity" element of section 186.22, subdivisions (e) and (f); (5) there was cumulative prejudice; and (6) the abstract of judgment must be corrected to delete the reference to a waiver of appellate rights. Sanchez also joins in Meza's appellate arguments.

Meza contends: (1) the trial court failed to instruct the jury that Sanchez was an accomplice as a matter of law; (2) the trial court erred by admitting his codefendants' statements against him; (3) the trial court gave incorrect, confusing, and conflicting

2

instructions regarding the use of his codefendants' statements; and (4) there was cumulative prejudice. Meza also joins in Sanchez's appellate arguments.

We will affirm the judgment as to both defendants but order the abstracts of judgments modified.

## II. BACKGROUND

### A. The Campos Shooting

Richard Campos was 21 years old on September 15, 2009. Campos was affiliated with a Norteño gang, and he had a XIV tattoo on his right forearm as well as other gang tattoos.

At about 9:45 p.m., Campos was in the driveway of his family's house on Roache Road in Watsonville, talking on a cell phone with Jessica Lopez. Lopez heard a male voice say, "where are you from," and she heard Campos reply that he did not "bang." Witnesses in the neighborhood heard gunshots and called the police, who responded and found Campos dead, near two cars. The cause of Campos's death was a gunshot that hit his neck and transected the carotid artery, apparently from a 9-millimeter bullet. 9-millimeter bullet casings were found at the scene, and bullet fragments were found in one of the cars.

On September 17, 2009, two days after Campos's shooting, Watsonville Police Officer Skip Prigge contacted Meza, who was walking with Gonzalez and other Sureño gang members on the street. Officer Prigge took a newspaper from the back pocket of Meza's pants. The front page of the newspaper contained an article about the Campos shooting. Gang members sometimes keep newspaper articles about crimes they have committed as a "badge of honor."

### B. Gang Testimony

The prosecution presented gang testimony through several witnesses, including Officer Prigge, Officer Juan Trujillo and Sergeant Morgan Chappell. Officer Trujillo had

3

served as a gang enforcement officer for the City of Watsonville, and he had spent his "whole career" investigating gang crimes. Sergeant Chappell's gang experience included working for the Watsonville Police gang unit since January of 2008. He had participated in several hundred gang investigations and over 100 gang arrests during the course of his law enforcement career. He spoke with Watsonville gang members every day on the job. He had spoken with other law enforcement officers regarding gang crimes, and he had reviewed reports of gang crimes.

Watsonville has two main gangs: Norteños, or northerners, and Sureños, or southerners. Sureños identify with the color blue, the number 13, and the word "sur," which is short for southern. Norteños identify with the color red, the number 14, and the Huelga bird. Norteños and Sureños are rivals. Sureños will use the term "Busters" to show disrespect towards Norteños. In Watsonville, the Poorside Watsonville gang is one of the two Sureño subsets.

Sanchez, Meza, Torres, and Gonzalez were members of Poorside Watsonville. Meza's gang moniker was "Little Psycho." Gonzalez's gang moniker was "Grifo." Prior to the Campos shooting, Torres was called "Moco," but afterwards, he was called "Spider." Sanchez's moniker was "Perico." Torres and Sanchez were cousins.

A person can become a member of a gang through a "jump in," during which the prospective gang member is physically assaulted by other gang members. For Sureños, the assault lasts for 13 seconds. To complete the jump-in process, a person must also perform a "jale," which is a gang term meaning "a mission." The jale can be a stabbing, a beating, or a shooting. Officer Trujillo believed that Poorside Watsonville required a person to perform the jale within 72 hours or three weeks of the jump in.

The structure of gangs often includes a person who collects money for the gang and may be referred to as the treasurer, a person who holds the gang's firearms and may be called the sergeant-at-arms, someone who enforces the gang's guidelines, someone who collects the gang dues, and someone who coordinates gang meetings.

4

According to Sergeant Chappell, the primary activities of Watsonville Sureños are "[s]tabbing, shooting, burglaries, weapons possessions, group attacks," and similar activities. He defined "primary activity" as "whatever the gang exists to do."

Sergeant Chappell testified about two predicate offenses for the purpose of establishing the "pattern of criminal gang activity" element of section 186.22, subdivisions (e) and (f).

First, Angel Magana, a Poorside Watsonville gang member, was convicted of being a felon in possession of a firearm and being an active participant in a criminal street gang. The convictions were established by certified court records, but Sergeant Chappell had learned about the details of the offenses from the officers who were involved in the investigation and from reading the police reports. The underlying incident had occurred in June of 2009. Magana and another Poorside Watsonville member had been in a vehicle that was searched by police, who found a firearm.

Second, Frederico Contreras, another Poorside Watsonville gang member, was convicted of assault with a deadly weapon and being an active participant in a criminal street gang. Again, the convictions were established by certified court records. Sergeant Chappell had been directly involved in the investigation of the offenses: he had spoken to one of the victims right after the offenses. Contreras and some companions had driven up to the victims and asked, "que varrio," meaning, "What hood are you from." Contreras and some of his companions had gotten out of the car and chased the victims, then stabbed one of them.

Sergeant Chappell testified that both Magana and Contreras were both active members of Poorside Watsonville at the time they committed the predicate offenses.

### C. Evidence Obtained Via Julian Melgoza

Poorside Watsonville gang member Julian Melgoza had become a police informant in the spring of 2009, following a probation search of his home that revealed his possession of drug paraphernalia. Melgoza provided the police with information that

5

led to arrests of Poorside Watsonville gang members: one who was a "wanted parolee" and two who were in possession of a firearm.

Based on information provided by Melgoza, police set up a motion-activated camera at a location where members of the Poorside Watsonville gang often met. Meza, Torres, and Gonzalez were among those present at a recorded gang meeting held on May 24, 2009. During a recorded gang meeting held on June 29, 2009, a car was burglarized and then set on fire. After Melgoza was identified as a participant in the vehicle arson, he agreed to further help the police.[2] He subsequently assisted with two controlled buys of heroin; one was from a Poorside Watsonville gang member.

On September 16, 2009, the day after the Campos shooting, Melgoza contacted Officer Trujillo. Melgoza claimed to have information about the Campos shooting, and he agreed to wear a wire and attend a meeting of the Poorside gang that was held a few days later, at Sanchez's home. Melgoza and Sanchez had a conversation that was recorded and transcribed.[3]

Sanchez talked about buying guns and about having money from the "hood." He referred to a .38-caliber gun that had been loaned to him and a 9-millimeter gun that had been purchased for around $250.

Sanchez and Melgoza then discussed the Campos shooting. Sanchez referred to Campos as "the victim." Sanchez said that according to the newspaper, Campos had been "talking to the chick on the phone" when "they did something to him." Sanchez referred to "the jale that happened"[4] and stated that four people had been involved: himself, "Spider" (Torres), "Lil Psycho" (Meza), and "Grifo" (Gonzalez). Sanchez stated, "I drove the car and those guys threw down." Sanchez then clarified that both he

---

[2] Melgoza was ultimately convicted of arson. At the time of trial, he was in custody due to a robbery conviction from an incident in March of 2012.

[3] Two different transcripts of the conversation were prepared for trial, by Officer Trujillo and a defense interpreter.

[4] The defense interpreter translated this phrase as "seriously, right?"

and Gonzalez had stayed in the car while the others "went for it." When Melgoza commented, "that's how . . . you do a mission," Sanchez responded that "everything came out really nice." Melgoza asked, "Just the way it should be, man; that's how, homie?" Sanchez responded, "With two homies and it has to be done with two guns, man." Sanchez also noted that Campos had been inside of his car when the group first saw him. He described how he had parked the car, the doors had opened, and "boom."

### D. Testimony of Christian Lopez Ramirez

Christian Lopez Ramirez (hereafter referred to as Lopez) was a member of Poorside Watsonville. He testified at trial pursuant to an immunity agreement, which he entered into after being arrested with Meza for burglary in December of 2009.[5]

When he was active in the Poorside Watsonville gang in 2008, Lopez had been the gang's drug dealer. He would also buy guns for the gang. In September of 2009, Sanchez had "the keys" to the gang, meaning that he collected money from the drug dealer and was "in charge of the whole hood."

Lopez testified about Sureño gang protocol, which included a rule against drive-by shootings. Sureños are required to get out of a car and shoot someone from close range. Another rule requires someone who is jumped into the gang to do a jale ("shoot someone or stab someone") by the time of the next meeting. It was not required that the person be killed, but a killing would bring more respect. An older gang member must go with the person performing the jale, or the incident has to be reported in the newspaper, in order to "vouch that you did it."

Lopez was present when Meza was jumped into Poorside. Meza wanted to do his jale that day, saying he wanted to go shoot someone, "but nothing happened." Lopez was also present when Sanchez, Meza, Torres, and Gonzalez went to go on the mission that

---

[5] Lopez dropped out of the gang and was placed in protective custody, then placed in the witness relocation program.

7

resulted in the Campos shooting.  Lopez heard Torres volunteer to go "to show him how it's done."

Lopez spoke to Sanchez after the Campos shooting.  Lopez remarked, "you guys got down," and Sanchez replied, "Ya, we got him."  Sanchez indicated that he had a conflict with one of Campos's brothers while in high school, that the Campos family was all Norteños, and that Campos had "got what he deserved."  Sanchez described how he drove to Roache Road and stayed in the car while Meza and Torres "took care of it."

Lopez also spoke with Torres about the Campos shooting.  Torres stated that he had walked up to Campos's car and asked him "Where are you from?"  Torres stated that he had shot Campos first, and that he had shot Campos in the face.  Meza had been scared, but he had also shot Campos after Torres told him, "Shoot him.  Shoot him."  Torres said he had used a 9-millimeter, and he showed Sanchez that he was carrying a .22-caliber revolver, saying that it had been used as well.

Lopez also spoke with Meza about the Campos shooting.  Lopez congratulated Meza, noting that "he got down," meaning that he had gained Lopez's respect.  Meza stated, "ya, ya, we got him."

### E.    Testimony of Gonzalez

Gonzalez testified at trial pursuant to a plea agreement related to his conduct in the Campos shooting.[6]  Gonzalez considered himself a Poorside Watsonville associate; he had never been formally jumped into the gang.

About a week before the Campos shooting, a gang meeting was held at Sanchez's house.  Sanchez, Meza, Torres, and Gonzalez all attended.  At the meeting, Sanchez took out a 9-millimeter gun and passed it around.  Sanchez said that the gun sometimes jammed up, but that he had test fired it and found that it worked.  Torres brought out a

---

[6] Gonzalez pleaded guilty to conspiracy to shoot at an occupied vehicle with a gang enhancement, as well as active participation in a criminal street gang.

.22-caliber revolver at the same meeting.  The guns were returned to Sanchez and Torres during the meeting.

After Meza was jumped into Poorside Watsonville, he asked Gonzalez to accompany him on his jale.  Meza asked if Gonzalez wanted to go "look for some busters," meaning Norteños.  Gonzalez agreed to go with Meza, and Meza came over about 15 minutes later.  Meza arrived on a bicycle, carrying a scooter.  Meza showed Gonzalez a .22-caliber revolver and said that they were going to go down the street to look for someone and "shoot 'em."  When Gonzalez saw the .22-caliber revolver, he recognized it as the one that Torres had at the meeting.  Gonzalez said that Meza should have taken the 9-millimeter gun instead.  Meza said he did not take the 9-millimeter because it might jam up on him.  Gonzalez knew that the .22-caliber revolver had only five shots in it, and he said that five shots were not enough, but Meza said it would be fine.

Gonzalez and Mesa walked around for about 30 minutes, but they did not find any Norteños.  They walked back to Gonzalez's house, then rode the bicycle and scooter to Meza's house, where Meza called Sanchez to ask for a ride.  Sanchez arrived about 10 minutes later, driving an SUV, with Torres in the front passenger seat.  Gonzalez and Torres got into the back of the SUV, and the group drove around looking for Norteños.  They saw someone who looked like a Norteño, but Sanchez said "let's not shoot him" because the person was with a girlfriend.

The group then drove to Roache Road, where they saw Campos talking on his cell phone near a car.  Meza said that Campos was a "buster" and noted that he had a XIV tattoo on his arm.  Sanchez stopped the car three houses away.  Gonzalez heard Torres cock a gun.  Meza and Torres then got out of the car and walked towards Campos, but they came back, saying that someone else was out there.   Meza and Torres got back into the car.  Sanchez turned the car around and stopped it on the other side of the street.  Meza and Torres again got out of the car and walked towards the place where Campos

9

had been standing.  Gonzalez heard gunshots, then saw Meza and Torres running back to the car.  After they got in the car, Torres said "that for sure he had shot him in the head."  The group then drove to Sanchez's house, where another gang member took the shells out of Meza's revolver.

Gonzalez participated in another gang mission in November of 2009.  Gonzalez had been the driver when another gang member shot at a Norteño but missed.  Gonzalez pled guilty to assault with a firearm in that case.

When Gonzalez was first contacted by the police regarding his participation in the instant case, he did not want to talk to them.  He eventually agreed to talk, but he initially "[m]ade up a story" about driving around trying to buy drugs.  He later told the police the truth.

### F.    Defense Testimony

The defense witnesses were Denise Choate, the interpreter who had prepared a second transcription of the Melgoza-Sanchez conversation, her husband Glenn, who had digitally enhanced and cleaned up the recordings of that conversation, and Scott Armstrong, an expert on bullets and bullet fragments who was called by Meza.  Armstrong examined some of the bullet fragments found at the scene of the Campos shooting and opined that while there was no question that a 9-millimeter gun was used, some of the bullet fragments might also have been from a .22-caliber gun.

None of the defendants testified at trial.

### G.    Charges, Verdicts, and Sentencing

Sanchez and Meza were charged with murder (§ 187, subd. (a)) and active participation in a criminal street gang (§ 186.22, subd. (a)).  As to each defendant, the information alleged that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)) and that a principal personally and intentionally discharged a firearm in the commission of the offense (§ 12022.53, subds. (b)-(e)(1)).  Special circumstance allegations were also alleged

10

pursuant to section 190.2, subdivision (a)(22). The same charges and special allegations were alleged as to Torres, and a joint trial was held as to all three defendants.

The jury convicted Sanchez of first degree murder, and it convicted Meza of second degree murder. The jury convicted both Sanchez and Meza of active participation in a criminal street gang. As to both Sanchez and Meza, the jury found that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang and that a principal personally and intentionally discharged a firearm in the commission of the offense.

The jury was unable to reach a verdict on first degree murder as to Torres, and the trial court declared a mistrial as to him.

At the sentencing hearing, the trial court imposed a prison term of 50 years to life for Sanchez, and it imposed a prison term of 40 years to life for Meza.

## III. DISCUSSION

### A. *Jury Instructions on Aiding and Abetting*

Sanchez contends the jury instructions erroneously stated that an aider and abettor could be guilty of first degree murder so long as the direct perpetrator committed a willful, premeditated, and deliberate murder, instead of requiring the jury to determine "whether each aider and abettor personally acted with malice and a willful, premeditated and deliberated intent to kill." Sanchez contends that the error violated his due process rights under the Fifth and Fourteenth Amendments and his rights to present a defense and to have each element of the offense determined beyond a reasonable doubt at a jury trial under the Sixth Amendment. Meza joins in this argument. (See Cal. Rules of Court, rule 8.200(a)(5).)

#### 1. Relevant Instructions Given

CALCRIM No. 400 was given as follows: "A person may be guilty of a crime in two ways. One, he may have directly committed this crime. He may have directly

11

committed the crime.  I will call that person the direct perpetrator.  [¶]  Two, he may have aided and abetted a perpetrator who directly committed the crime.  I will call the person the aider and abettor.  [¶]  A person is guilty of a crime whether he committed it personally or aided and abetted the direct perpetrator.”

CALCRIM No. 401 was given as follows:  “To prove that a person is guilty of a crime based on aiding and abetting that crime, the People must prove that, one, the direct perpetrator committed the crime.  [Two,] the person knew that the direct perpetrator intended to commit the crime.  Three, before or during the commission of the crime the person intended to aid and abet the direct perpetrator in committing the crime; and, four, the person’s words or conduct did in fact aid and abet the direct perpetrator’s commission of the crime.  [¶]  Someone aids and abets a crime if he knows of the perpetrator’s unlawful purpose and he specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the direct perpetrator’s commission of that crime. . . .”

CALCRIM No. 520 was given as follows:  “Each defendant is charged in Count 1 with murder in violation of Penal Code Section 187.  To prove a defendant is guilty of this crime, the People must prove that as a direct perpetrator[,] . . . a defendant committed an act that caused the death of another person.  And when that defendant acted, he had a state of mind called malice aforethought. . . .”[7]

CALCRIM No. 521 was given as follows:  “Each defendant has been prosecuted for first degree murder under the theory that the murder was willful, deliberate and premeditated.  [¶]  *You may not find any of the defendants guilty of first degree murder*

---

[7] The trial court’s modifications to the standard version of CALCRIM No. 520 included changing the phrase “the defendant” to the phrases “each defendant,” “a defendant,” and “that defendant.”

12

*unless all of you agree that the People have proved that one of the defendants committed a willful, deliberate and premeditated murder.*"[8]  (Italics added.)

### 2.    Analysis

Sanchez acknowledges that his trial counsel did not object to these instructions, but he contends that this court should address the merits of his claim because it involves "a pure question of law" that affected his "substantial constitutional rights."  (See § 1259 [an appellate court may "review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"].)  Alternatively, Sanchez contends this court should address the merits of his claim because "any forfeiture was a result of ineffective assistance of counsel."  We will assume that the modified instructions affected Sanchez's substantial rights if they permitted the jury to find him guilty of first degree murder without finding that he personally acted with malice and a willful, premeditated and deliberate intent to kill, and therefore we will consider the merits of his claim.

In arguing that the instructions were flawed because they did not require the jury to determine "whether each aider and abettor personally acted with malice and a willful, premeditated and deliberated intent to kill," Sanchez relies primarily on *People v. McCoy* (2001) 25 Cal.4th 1111 (*McCoy*).  In *McCoy*, the court explained that "outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator" in order for the aider and abettor to be vicariously liable.  (*Id.* at p. 1118.)  Thus, when the charged offense is murder, "the aider and abettor must know and share the murderous intent of the actual perpetrator."  (*Ibid.*)

---

[8] The trial court's modifications to the standard version of CALCRIM No. 521 included changing the phrase "the defendant" to the phrases "each defendant," "any of the defendants," and "one of the defendants."

13

"Aider and abettor liability is premised on the combined *acts* of all the principals, but on the aider and abettor's *own mens rea*." (*Id.* at p. 1120, italics added.)[9]

Sanchez points out that while CALCRIM Nos. 400 and 401 told the jury that the aider and abettor must know that the direct perpetrator intended to commit "the crime" and intend to aid and abet the perpetrator in committing "the crime," the instructions did not specify what "the crime" was or indicate that an aider and abettor could be less culpable than the direct perpetrator. Sanchez also points out that the modified version of CALCRIM No. 520 only told the jury how to find a direct perpetrator guilty of murder and that the modified version of CALCRIM No. 521 stated that the jury could not find "any of the defendants guilty of first degree murder" unless it found that "one of the defendants committed a willful, deliberate and premeditated murder." According to Sanchez, these instructions combined to tell the jury that "the aider[s] and abettors were equally guilty as the direct perpetrator, while never requiring [the jury] to find that the aiders and abettors *personally* acted with malice or a premeditated, deliberate intent to kill."

We apply the independent or de novo standard of review when assessing whether jury instructions correctly state the law "and also whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration [citations]." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "[I]n determining the correctness of jury instructions, we consider the instructions as a whole. [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 49 (*Friend*).) We presume that jurors are "able to understand and correlate instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852 (*Sanchez*).) The relevant question is "whether there is a reasonable likelihood that the

---

[9] In fact, the *McCoy* court held, an aider and abettor may even be guilty of "greater homicide-related offenses than those the actual perpetrator committed." (*McCoy, supra,* 25 Cal.4th at p. 1114.)

14

jury misconstrued or misapplied" the instructions. (*People v. Clair* (1992) 2 Cal.4th 629, 663 (*Clair*).)

Sanchez points out that CALCRIM No. 521 contained an incorrect statement, telling the jury that it could not find any of the defendants guilty of first degree murder unless "the People have proved that one of the defendants committed a willful, deliberate and premeditated murder. . . ."

As Sanchez argues, he could not be found guilty of first degree murder based only on a jury finding that one of the other defendants committed first degree murder. In order to convict Sanchez of first degree murder, the jury had to find that Sanchez "knew that the direct perpetrator intended to commit" first degree murder, that Sanchez "intended to aid and abet" the direct perpetrator in committing first degree murder, and that Sanchez "did in fact aid and abet the direct perpetrator's commission of" first degree murder. (See CALCRIM No. 401.)

However, when we consider modified CALCRIM No. 521 in conjunction with the other instructions (see *Friend, supra,* 47 Cal.4th at p. 49), we conclude the instructions did not permit the jury to convict Sanchez of first degree murder based only on a finding that the direct perpetrator committed first degree murder. CALCRIM No. 400 informed the jury that a person could be guilty of a crime as an aider and abettor. CALCRIM No. 520 informed the jury that the charged crime was murder, and CALCRIM No. 521 specified that each defendant was charged with first degree murder and that "[a] defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation." CALCRIM No. 401 informed the jury that in order to be convicted as an aider and abettor, Sanchez had to know that the direct perpetrator intended to commit "the crime"—i.e., first degree murder—and had to intend to aid and abet the commission of "the crime." As noted above, we must presume that the jurors were able to correlate the relevant instructions. (*Sanchez, supra,* 26 Cal.4th at p. 852.) Because the instructions, together, informed the jury that Sanchez could not be

15

convicted of first degree murder unless he "intended to aid and abet" a first degree murder, there is no "reasonable likelihood that the jury misconstrued or misapplied" the instructions so as to convict Sanchez of first degree murder without considering his individual mental state. (*Clair, supra,* 2 Cal.4th at p. 663.)

Our conclusion is buttressed by the fact that, during argument to the jury, the prosecutor never argued that Sanchez or Meza could be convicted of first degree murder based on Torres's mental state alone. The prosecutor clearly identified "premeditated murder" as the target offense when discussing aiding and abetting liability. In addition, as Sanchez even acknowledges, the jury's verdicts strongly indicate that the jury understood each defendant's liability was independent rather than dependent on the mental state of the direct perpetrator. The jury convicted Sanchez, who was not one of the shooters, of first degree murder. The jury convicted Meza, one of the shooters, of second degree murder. And the jury failed to reach a verdict on first degree murder as to Torres, the other shooter and the person who apparently fired the bullet that killed Campos.

In sum, after reviewing the instructions given, the prosecutor's argument, and the jury's verdicts, we find no merit to Sanchez's challenge to the instructions on aiding and abetting.

### B.      Failure to Give Requested Instruction on Aiding and Abetting

Sanchez contends the trial court erred by refusing to instruct the jury that an aider and abettor may be convicted of a lesser crime than the direct perpetrator. Sanchez contends the error violated the due process clauses of the Fifth and Fourteenth Amendments as well as the compulsory process and confrontation clauses of the Sixth Amendment. Meza joins in this argument.

The requested but refused instruction provided in part: "When the actual perpetrator of an offense commits a crime, or a degree of a crime, that is not a reasonably foreseeable consequence of the act aided and abetted, the aider and abettor cannot be

16

convicted of the crime, or the degree of the crime, committed by the actual perpetrator. However, the aider and abettor can be convicted of a lesser degree of crime, or a lesser crime, than the one committed by the actual perpetrator, if that lesser degree of crime, or lesser crime, was a reasonably foreseeable consequence of the act aided and abetted. [¶] Thus, if all of you find that an aider and abettor is not guilty of a greater charged crime, or a greater degree of a charged crime, you may find him guilty of a lesser crime, or a lesser degree of crime, if you are convinced beyond a reasonable doubt that the aider and abettor is guilty of that lesser crime, or lesser degree of crime. A defendant may not be convicted of both a greater and lesser crime for the same conduct. The charge affected by this instruction is the charge of murder which can be either in the first or second degree."

The trial court refused to give the instruction, finding that it was argumentative and duplicative of other instructions. (See *People v. Moon* (2005) 37 Cal.4th 1, 30 (*Moon*) ["a trial court may properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing . . . , or if it is not supported by substantial evidence"].) We review the trial court's ruling under the de novo standard of review. (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.)

Sanchez points out that his proposed instruction was an accurate statement of the law under *People v. Woods* (1992) 8 Cal.App.4th 1570 (*Woods*). In *Woods*, one defendant (Windham) was prosecuted on the theory that he aided and abetted the other defendant (Woods) in committing assaults with a firearm. (*Id.* at p. 1579.) Both defendants were convicted of first degree murder of a separate victim, who Woods killed during the getaway, on the theory that the murder was a reasonably foreseeable consequence of the assaults. (*Id.* at pp. 1577-1578.) The appellate court held that the trial court "had a duty to inform the jurors they could convict Windham of second degree murder as an aider and abettor even though they found Woods was guilty of first degree

17

murder," since the evidence raised a question as to whether first degree murder was a reasonably foreseeable consequence of the assaults. (*Id.* at p. 1578.)

Sanchez acknowledges that the *Woods* case involved application of the natural and probable consequences doctrine of aiding and abetting (see *id.* at p. 1584) whereas this case was not prosecuted under that theory. He argues the proposed instruction was nevertheless necessary because "no other instruction set forth the rule that an aider and abettor . . . cannot be held liable for a crime which was not a reasonably foreseeable consequence of the acts aided and abetted." Sanchez contends that the evidence supported the instruction because the jury could have found that Sanchez intended to aid and abet a drug purchase or an unintentional shooting.

As the Attorney General points out, the California Supreme Court has held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles. [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 158-159 (*Chiu*).) Here, the jury was properly instructed only on direct aiding and abetting liability principles, because the charged offense was first degree premeditated murder. As this case was not prosecuted on a natural and probable consequences theory, giving the requested instruction would have been "potentially confusing" to the jury. (See *Moon, supra,* 37 Cal.4th at p. 30.) The requested instruction was also not "supported by substantial evidence." (*Ibid.*) There was no substantial evidence supporting a finding that Sanchez intended to aid and abet a drug purchase. While Gonzalez initially told the police that the group was just looking for marijuana, he subsequently informed the police and testified that the group was looking for a Norteño to shoot. There was also no substantial evidence supporting a finding that Sanchez intended to aid and abet a mere assault, rather than a homicide. Sanchez's own statements before and after the shooting reflected that he knew the intent of the mission was to shoot a Norteño and thus that he acted with, at a minimum, implied malice. (See

18

*People v. Sarun Chun* (2009) 45 Cal.4th 1172, 1205.) When the group first identified a possible victim, Sanchez suggested they "not shoot" the person because he was with a girlfriend. Sanchez later commented that the mission "came out really nice," indicating that rather than being surprised by Campos's death, the homicide was consistent with what he had intended.

On this record, since the proposed instruction would have been "potentially confusing" and was not "supported by substantial evidence" (*Moon, supra,* 37 Cal.4th at p. 30), the trial court did not err by refusing to give the instruction.

### C.    Gang Evidence

Sanchez advances two contentions concerning the evidence supporting the gang count (§ 186.22, subd. (a)), the gang enhancement (*id.,* subd. (b)(1)), and the firearm enhancement (§ 12022.53, subds. (b)-(e)). First, he contends there was insufficient evidence that the "primary activities" of Poorside Watsonville included crimes enumerated in section 186.22, subdivision (e). Second, he contends the trial court erroneously admitted inadmissible testimonial hearsay to prove that Poorside Watsonville had engaged in the "pattern of criminal gang activity" required by section 186.22, subdivision (f). Meza joins in these arguments.

#### 1.    Relevant Statutes

Section 186.22, subdivision (a) applies to "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang . . . ."

Section 186.22, subdivision (b)(1) applies to "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

19

Section 12022.53, subdivision (e) provides for enhancements that "apply to any person who is a principal in the commission of an offense" when the person "violated subdivision (b) of Section 186.22" and "any principal in the offense" personally used or discharged a firearm.

The phrase "criminal street gang" is defined in section 186.22, subdivision (f) as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its *primary activities* the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a *pattern of criminal gang activity*." (Emphasis added.)

The phrase "pattern of criminal gang activity" is defined in section 186.22, subdivision (e) as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ."

## 2. Primary Activities

The trial court instructed the jury that in order to find that Poorside Watsonville was a criminal street gang, it had to find that the primary activities of the gang were the commission of assault with a deadly weapon or felon in possession of a firearm, both of which are enumerated offenses in section 186.22, subdivision (e). Sanchez contends the evidence was insufficient to establish that committing those crimes was a primary activity of Poorside Watsonville, and he contends that the failure of proof violated his right, under the Fifth, Sixth, and Fourteenth Amendments, to have a jury determine each element of the crime beyond a reasonable doubt.

20

In addressing this claim, " 'we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507; see *People v. Catlin* (2001) 26 Cal.4th 81, 139 [same standard applies to review of evidence to support a gang enhancement finding], overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.]" (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id.* at p. 324.) "Also sufficient [to show the gang's primary activities] might be expert testimony," i.e., testimony by a gang expert based on the expert's conversations with gang members, the expert's personal investigations of gang crimes, and information the expert has obtained from other law enforcement officers. (*Ibid.*; see *People v. Gardeley* (1996) 14 Cal.4th 605, 620 (*Gardeley*).)

In this case, the prosecution's main gang expert—and the witness who rendered an opinion about Poorside Watsonville's primary activities—was Sergeant Chappell. As noted above, he had participated in several hundred gang investigations and over 100 gang arrests, spoken with gang members every day on the job, spoken with other law enforcement officers regarding gang crimes, and reviewed reports of gang crimes. He testified that the primary activities of Watsonville Sureños were "stabbing, shooting, burglaries, weapons possessions, group attacks," and similar activities.

Sanchez contends that the instant case is similar to *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*), in which a gang expert testified that he knew that the minor's gang had " 'committed quite a few assaults with a deadly weapon, several

21

assaults,' " and that they had been " 'involved in murders' " as well as " 'auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' " (*Id.* at p. 611.) The court concluded that this testimony did not constitute substantial evidence, because the expert's testimony "lacked an adequate foundation." (*Id.* at p. 612.) The expert in *Alexander L.* had not given "specifics" as to the circumstances of any crimes, nor had he explained "where, when, or how [he] had obtained the information." (*Ibid.*) It was thus "impossible to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Ibid.*, fn. omitted.)

*Alexander L.* is distinguishable because here, Sergeant Chappell did provide the basis for his opinion, which included the hundreds of gang crime investigations he had personally participated in. Sergeant Chappell also provided specifics about a prior assault with a deadly weapon committed by Poorside Watsonville gang members, which he had personally investigated, and he testified about a Poorside Watsonville gang member's conviction of the crime of being a felon in possession of a firearm, which was shown by certified court records. Thus, the expert testimony here was reliable. (See *Alexander L., supra,* 149 Cal.App.4th at p. 612.)

The evidence in this case was similar to the evidence that supported a primary activities finding in *People v. Martinez* (2008) 158 Cal.App.4th 1324 (*Martinez*). In *Martinez*, the gang expert was familiar with the defendant's gang "based on regular investigations of its activity and interaction with its members." (*Id.* at p. 1330.) He testified that the gang's primary activities included "robbery, assault—including assaults with weapons, theft, and vandalism," and he testified about two prior gang offenses, both robberies, which had occurred in separate years. (*Ibid.*) The *Martinez* court held that the gang expert's testimony was sufficient "to prove the gang's primary activities fell within the statute." (*Ibid.*)

22

We conclude that in this case, Sergeant Chappell's testimony provided substantial evidence that the primary activities of the Poorside Watsonville gang were the commission of assault with a deadly weapon or felon in possession of a firearm, as provided in the trial court's instruction.

### 3.    Pattern of Criminal Gang Activity

Sanchez contends the trial court erred by allowing the "pattern of criminal gang activity" element of section 186.22, subdivision (e) to be proven by the Magana and Contreras guilty pleas and by extrajudicial statements gathered by police officers during criminal investigations. Sanchez contends that this evidence constituted testimonial hearsay, the use of which violated his confrontation rights under the Sixth and Fourteenth Amendments.[10]

We begin by reviewing applicable confrontation clause principles and case law. The Sixth Amendment to the United States Constitution guarantees the accused in criminal prosecutions the right "to be confronted with the witnesses against him [or her]." In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that this provision prohibits the admission of testimonial hearsay unless the witness is unavailable or there was a prior opportunity for cross-examination. (*Id.* at p. 68.) The *Crawford* court did not provide a definition of " 'testimonial' statements" but noted that there were "[v]arious formulations" of the term, including: " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials,

---

**[10]** Sanchez raised this issue below by moving, in limine, for a ruling precluding the prosecution from proving the "pattern of criminal gang activity" by certified court records of other people's guilty pleas, and for a ruling precluding the gang expert from relying on hearsay. Sanchez also filed a motion for a new trial in which he raised this issue.

such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [citation]." (*Id.* at pp. 51-52; see also *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 310 (*Melendez-Diaz*).)

The United States Supreme Court also declined to "attempt[]to produce an exhaustive classification" of testimonial statements in *Davis v. Washington* (2006) 547 U.S. 813 (*Davis*). The court did explain the difference between testimonial and nontestimonial statements made to the police: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822, fn. omitted; see also *Michigan v. Bryant* (2011) 562 U.S. 344, 349.)

The United States Supreme Court considered whether "basis evidence" —that is, evidence that provides a basis for an expert opinion—is admissible under the confrontation clause in *Williams v. Illinois* (2012) 567 U.S. __ [132 S.Ct. 2221] (*Williams*). In *Williams,* the question was, "does *Crawford* bar an expert from expressing an opinion based on facts about a case that have been made known to the expert but about which the expert is not competent to testify?" (*Id.* at p. ___ [132 S.Ct. at p. 2227].) The *Williams* court examined whether a laboratory expert could rely on a DNA report from a prior criminal case in rendering his opinion that the defendant's DNA profile matched the prior sample. In a 4-1-4 opinion, the court held that admission of the expert's testimony did not violate the confrontation clause.

A plurality of the *Williams* court found that the DNA report was not offered for its truth, but that even if the "basis evidence" was offered for its truth, it was not testimonial.

24

(*Williams, supra,* 567 U.S. at p. ___ [132 S.Ct at p. 2228] (plur. opn. of Alito, J., joined by Roberts, C. J., Kennedy & Breyer, JJ.).)  The DNA report was "produced before any suspect was identified," it was sought "for the purpose of finding a rapist who was on the loose" rather than to obtain evidence against the defendant, and it was "not inherently inculpatory."  (*Id.* at p. ___ [132 S.Ct at p. 2228].)  Justice Thomas agreed with the plurality on this point, finding that the "basis evidence" was not testimonial because it "lack[ed] the solemnity of an affidavit or deposition" and, "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation."  (*Id.* at p. ___ [132 S.Ct. at p. 2260] (conc. opn. of Thomas, J.).)  The remaining four justices joined in a dissent authored by Justice Kagan; they rejected the idea that the expert's testimony was not offered for its truth. (*Id.* at pp. ___ [132 S.Ct. at pp. 2265, 2268] (dis. opn. of Kagan, J.).)

Neither the United States Supreme Court nor the California Supreme Court has yet considered whether the Confrontation Clause prohibits a gang expert from relying on hearsay to provide evidence that a particular crime was committed for the benefit of a gang.[11]  In *Gardeley, supra,* 14 Cal.4th 605, the California Supreme Court reasoned that, "[c]onsistent with [the] well-settled principles" concerning expert witness testimony, a detective "could testify as an expert witness and could reveal the information on which he had relied in forming his expert opinion, including hearsay." (*Id.* at p. 619.)  *Gardeley* reasoned that a gang expert can rely on inadmissible hearsay in rendering an opinion, because such evidence is not offered as " 'independent proof' of any fact."  (*Ibid.*)  However, *Gardeley* did not address a Confrontation Clause claim nor the question whether testimonial hearsay can be admitted through a gang expert to prove elements of

---

[11] The California Supreme Court is currently considering whether the Sixth Amendment right to confrontation bars a gang expert's reliance on testimonial hearsay. (*People v. Sanchez* (2013) 223 Cal.App.4th 1, review granted Feb. 24, 2014, S216681; see also *People v. Archuleta* (2014) 225 Cal.App.4th 527, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *Sanchez*].)

25

the gang enhancement such as the "pattern of criminal gang activity." (See § 186.22, subd. (f).)

We proceed to consider Sanchez's arguments and the evidence. As noted above, the evidence of prior criminal offenses by Poorside Watsonville gang members was presented during Sergeant Chappell's testimony. The first predicate offense was Magana's convictions of being a felon in possession of a firearm and being an active participant in a criminal street gang. The convictions were established by certified court records, but Sergeant Chappell had learned about the details of the offenses from the officers who were involved and from reading the police reports. The second predicate offense was Contreras's convictions of assault with a deadly weapon and being an active participant in a criminal street gang. Again, the convictions were established by certified court records, but Sergeant Chappell had been directly involved in the investigation of the offenses. Sergeant Chappell testified that Magana and Contreras were both active members of Poorside Watsonville at the time they committed the offenses.

Sanchez contends that the certified court records from the Magana and Contreras cases constituted testimonial hearsay. He relies primarily on *Kirby v. United States* (1899) 174 U.S. 47 (*Kirby*) and *People v. Cummings* (1993) 4 Cal.4th 1233, 1294, 1321 (*Cummings*). Neither case supports Sanchez's position. In *Kirby*, the defendant was convicted of receiving stolen property. To prove that the property was stolen, the prosecution presented a record from a prior trial involving different defendants, who had pleaded guilty to stealing the property. In holding that admission of that evidence violated Kirby's confrontation clause rights, the court distinguished between the *fact* of the prior convictions, which "could only be established by a record" (*Kirby, supra,* 174 U.S. at p. 54) and "the fact that the property was stolen," which was an element of the offense (*id.* at p. 55). In *Cummings*, the court records were similarly held to be inadmissible hearsay to the extent that they were introduced as substantive evidence of a defendant's guilt. (*Cummings, supra,* 4 Cal.4th at pp. 1294-1295 [evidence showing one

26

defendant's wife had been convicted of being an accessory], 1321-1322 [evidence that codefendant had pleaded guilty].)  Here, the court records were not introduced to show that Sanchez was guilty but rather to show the fact that Magana and Contreras had been convicted of certain crimes.

Sanchez's position is also not supported by another case he cites, *People v. Hill* (2011) 191 Cal.App.4th 1104, which held that the admission of a federal plea agreement containing a gang member's statements violated the confrontation clause.  (*Id.* at p. 1136.)  The conviction records admitted here did not include the statements of any gang members.

As the Attorney General points out, several California Courts of Appeal have held that records of conviction are nontestimonial, and thus outside the scope of the Sixth Amendment's confrontation clause, when offered to prove the fact of the conviction. (See *People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225 [records that are "prepared to document acts and events relating to convictions and imprisonments" are beyond the scope of *Crawford*]; see also *People v. Moreno* (2011) 192 Cal.App.4th 692, 710-711 [following *Taulton*]; *People v. Morris* (2008) 166 Cal.App.4th 363, 373 [same].)  In this case, the conviction records of Magana and Contreras were offered only to prove the facts of those convictions, including the conviction dates, and thus the records fell outside the scope of the confrontation clause.

Here, the only evidence that arguably constituted testimonial hearsay was Sergeant Chappell's testimony about the facts of the Magana offenses, which he learned about by reviewing police reports and speaking to the officers who had been involved in that case. (See *Bullcoming v. New Mexico* (2011) 564 U.S. ___, ___ [131 S.Ct. 2705, 2710, 2717] [holding that a document "created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, ranks as testimonial"].)  However, the trial court instructed the jury

27

not to consider that evidence for its truth.[12] Further, as Sanchez acknowledges, the "details of the predicate crimes" were not necessary. Moreover, the Magana offense was not necessary for proof of the requisite "pattern of criminal gang activity" (§ 186.22, subds. (e) & (f)), since the charged crime can be one of the two predicate offenses, and Sergeant Chappell's testimony about the Contreras offenses came from his own personal knowledge. (*Gardeley, supra,* 14 Cal.4th at p. 625.) Any error was thus harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

In sum, we conclude that the trial court did not commit reversible error by admitting testimonial hearsay to show that Poorside Watsonville members engaged in a "pattern of criminal gang activity." (§ 186.22, subds. (e) & (f).)

### D.    *Accomplice Corroboration Instruction*

Meza contends the trial court failed to instruct the jury that Sanchez was an accomplice as a matter of law and that therefore Sanchez's statements implicating Meza could only be considered if those statements were corroborated by other evidence. (See CALCRIM No. 335.)[13] Meza contends that without the statements of Sanchez, Lopez, and Gonzalez, "the remaining evidence is insufficient to establish Meza's participation in

---

[12] During Sergeant Chappell's testimony, the trial court instructed the jury: "So what you need to understand . . . is that because [Sergeant Chappell] has no personal knowledge of these facts, because the individuals who are referenced . . . are not here to be cross-examined and there's . . . no testimony under oath by the persons who do have personal knowledge, I'm permitting you to hear this only because this is information that experts are permitted to rely on in forming expert opinion. So you may not consider . . . what he's testifying to for the truth; namely, that these events occurred on this date. He reviewed this information in the reports and it's forming in part the basis for his rendering his opinion testimony to you. So don't consider what he's telling you for its truth. You can consider it in evaluating the underlying reasons as to why he's reaching the opinions he's reaching in this case."

[13] The jury was instructed that before it could consider Sanchez's statements to Gonzalez and Lopez, it had to determine whether Sanchez was an accomplice, and that if Sanchez was an accomplice, his statements required corroboration. (See CALCRIM No. 334.)

28

this crime." Meza contends that by failing to instruct the jury that Sanchez was an accomplice of law, the trial court violated Meza's rights under state law and under the due process clause of the federal constitution.

Section 1111 provides that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

" 'Testimony,' as used in section 1111, includes ' "all out-of-court statements of accomplices . . . *used as substantive evidence of guilt* which are made under suspect circumstances." ' " (*People v. Brown* (2003) 31 Cal.4th 518, 555 (*Brown*).)

In *Brown,* the California Supreme Court held that there was no need to instruct the jury that a coparticipant named Fields was an accomplice as a matter of law for purposes of the accomplice corroboration requirement, despite the fact that Fields was subject to prosecution for the same criminal offenses as Brown, because Fields's out-of-court statements to a police detective were "properly found to be declarations against penal interest." (*Brown, supra,* 31 Cal.4th at p. 555; see Evid. Code, § 1230.) The court explained, " 'The usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is *itself sufficiently reliable* to be allowed in evidence.' [Citation.]" Since Fields's statements "were themselves made under conditions sufficiently trustworthy to permit their admission into evidence despite the hearsay rule," . . . no corroboration was necessary, and the court was not required to instruct the jury to view Fields's statements with caution and to require corroboration." (*Id.* at p. 555-556.)

Meza acknowledges that some of Sanchez's out-of-court statements were against Sanchez's penal interest, but he contends that other out-of-court statements by Sanchez were not " 'specifically disserving' " of Sanchez's penal interest because they also implicated Meza. (See *People v. Duarte* (2000) 24 Cal.4th 603, 612 (*Duarte*).) For instance, Sanchez told Melgoza that Meza had been one of the four people involved, and although Sanchez admitted he had been the driver, he told Melgoza that he and Gonzalez had stayed in the car while "those guys threw down."

Even assuming that not all of Sanchez's out-of-court statements were " 'specifically disserving' " of Sanchez's penal interests so as to qualify as declarations against interest (*Duarte, supra,* 24 Cal.4th at p. 612), the trial court was not required to instruct the jury that Sanchez was an accomplice as a matter of law because, as the Attorney General contends, Sanchez's out-of-court statements were not made under " ' "suspect circumstances." ' " (*Brown, supra,* 31 Cal.4th at p. 555.) " ' "The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police." ' [Citation.]" (*Ibid.*) Here, Sanchez's out-of-court statements were not made under police questioning or other suspect circumstances but rather to members of his gang, in informal settings. (See *People v. Maciel* (2013) 57 Cal.4th 482, 526 [statements made by a gang member during a secretly videotaped gang meeting were not made under " 'suspect circumstances' " and did not require instruction on accomplice corroboration].)

Contrary to Meza's claim, the fact that Melgoza was working as a police informant at the time Sanchez made certain statements to him does not change our analysis. (See *People v. Jeffery* (1995) 37 Cal.App.4th 209, 218 [defendant's statements made to an undercover police officer during a drug sale, without defendant's knowledge that the person was an undercover police officer, were not "testimony" within the meaning of section 1111 and did not require corroboration].)

We conclude the trial court correctly did not instruct the jury that Sanchez was an accomplice as a matter of law because Sanchez's out-of-court statements did not constitute "testimony" within the meaning of section 1111. Because those statements were not "testimony" within the meaning of section 1111, they did not require corroboration and could be used to corroborate the testimony of Lopez and Gonzalez. Thus, contrary to Meza's claim, the evidence at trial was not insufficient to connect him with the charged offenses.

### E.    Admission of Codefendants' Statements

Meza next contends that the trial court improperly admitted the out-of-court statements of Sanchez and Torres that implicated Meza in the shooting, violating Meza's Sixth Amendment rights of confrontation and cross-examination, his Fifth Amendment rights to due process and a fair trial, and state law.

#### 1.    Aranda-Bruton

We first address Meza's claim that the Sanchez and Torres statements were inadmissible under the *Aranda-Bruton* rule.[14]  (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.)  The *Aranda-Bruton* rule provides that the confrontation clause generally prohibits the admission, at a joint trial, of one defendant's confession "that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt." (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.)

Meza contends that the *Aranda-Bruton* rule applies even when the codefendant's confession amounts to a non-testimonial statement under *Crawford, supra,* 541 U.S. 36. Other California Courts of Appeal have concluded otherwise, holding that the Sixth Amendment prohibits only the admission of testimonial statements, even when the

---

[14] This issue was raised below in the context of the defendants' severance motions. The trial court ultimately denied the motion for separate trials, finding that the statements the defendants had identified as posing *Aranda-Bruton* problems were not testimonial under *Crawford, supra,* 541 U.S. 36.

31

statement at issue is the confession of a codefendant. (See *People v. Arceo* (2011) 195 Cal.App.4th 556, 575 (*Arceo*); *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401-1402 (*Arauz*).) Federal courts are generally in accord. (See, e.g., *United States v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326 ["Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."]; *U.S. v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85.) And the California Supreme Court has recognized that "[o]nly the admission of testimonial hearsay statements violates the confrontation clause . . . ." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 812.)

In *Arceo,* the court rejected the defendant's argument "that the *Bruton* line of cases represents a 'special rule' that applies to extrajudicial statements of unavailable codefendants who make incriminating statements, 'a rule that survives the "testimonial vs. nontestimonial" classification.' " (*Arceo, supra,* 195 Cal.App.4th at p. 574.) Thus, non-testimonial inculpatory statements made by the defendant's coparticipants were not inadmissible under the confrontation clause. (*Id.* at p. 575.) Likewise, in *Arauz,* the confrontation clause did not bar the admission of inculpatory statements made by one of the defendants to a fellow inmate/informant. (*Arauz, supra,* 210 Cal.App.4th at p. 1397.)

We agree with the courts holding that the *Aranda-Bruton* rule does not apply when the codefendant's confession amounts to a non-testimonial statement under *Crawford, supra,* 541 U.S. 36, because the Sixth Amendment applies only to testimonial statements. Thus, Meza's confrontation clause rights were not violated by the trial court's admission of the out-of-court statements of Sanchez and Torres that implicated Meza in the homicide because those statements were non-testimonial.

### 2.     Declarations Against Interest

We next address Meza's claim that the admission of the Sanchez and Torres statements violated state law, because those statements were not admissible under

Evidence Code section 1230 as declarations against interest, or under any other exception to the hearsay rule.[15]

Evidence Code section 1230 provides: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him [or her] to the risk of civil or criminal liability, or so far tended to render invalid a claim by him [or her] against another, or created such a risk of making him [or her] an object of hatred, ridicule, or social disgrace in the community, that a reasonable man [or woman] in his [or her] position would not have made the statement unless he [or she] believed it to be true."

In addition to showing that the declarant is unavailable and that the declaration was against the declarant's penal interest when made, the proponent of the evidence must show "that the declaration was sufficiently reliable to warrant admission despite its hearsay character" before a statement can be admitted under Evidence Code section 1230. (*Duarte, supra,* 24 Cal.4th at pp. 610-611.) On appeal, we review the admission of a statement under this hearsay exception for abuse of discretion. (*People v. Valdez* (2012) 55 Cal.4th 82, 143 (*Valdez*).)

Meza contends that the out-of-court statements made by Sanchez and Torres were unreliable and that, to the extent the statements implicated Meza, the statements were not against Sanchez and Torres's penal interests. Meza asserts that the statements were only partially inculpatory, pointing out that Sanchez "placed the greatest responsibility for the shooting on Meza and Torres" by stating that he was merely the driver, and that Torres "spread the blame" by stating that both he and Meza shot at Campos. (See *Duarte, supra,* 24 Cal.4th at p. 612 ["a hearsay statement 'which is in part inculpatory and in part

---

[15] During motions in limine, the trial court found the challenged statements admissible as declarations against interest and as statements of co-conspirators.

exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible' "].) Meza also contends that the statements were unreliable because they were made to fellow gang members and thus not likely to subject Sanchez and Torres to criminal liability, although he acknowledges that the California Supreme Court has found that statements made in confidence to other gang members are trustworthy. (See *Valdez, supra,* 55 Cal.4th at p. 144.)

Similar arguments were rejected in *Arceo,* where the court held that certain out-of-court statements made by a codefendant were admissible as to Arceo as declarations against interest. In the statements, one codefendant described the offenses (murders) to a relative of another codefendant. The declarant was described as " 'bragging' " about his conduct, which included shooting one of the victims and handing the gun off to Arceo, who shot a second victim. (*Arceo, supra,* 195 Cal.App.4th at p. 576.) The portion of the statement that portrayed Arceo as the shooter was "specifically disserving" of the declarant's penal interests because, by admitting that he had handed Arceo the gun prior to the second shooting, the declarant was "clearly subjecting [himself] to criminal liability" for that murder. (*Id.* at p. 577.) The statement was also trustworthy under the circumstances, because it was "not made in a custodial context" or in the context of blame-shifting or spreading, but rather in a conversation between friends. (*Ibid.*)

Even more similar were statements found admissible as declarations against interest in *Arauz.* In that case, an accomplice to a gang shooting incident made statements to a person jailed in an adjacent cell, not knowing that the person was a confidential police informant. (*Arauz, supra,* 210 Cal.App.4th at p. 1399.) The declarant admitted that "he and his 'homies' " had committed the shooting, explaining that he had driven the car and that the two codefendants had committed the actual shootings. (*Ibid.*) The declarant also admitted knowing that the drive-by shooting had been committed in violation of Mexican Mafia rules. (*Ibid.*) The declarant's statements were held to be

specifically disserving of his penal interests rather than exculpatory in any way, and, because he named the actual shooters, trustworthy. (*Id.* at p. 1401.)

In this case, all of the challenged statements were made by Sanchez and Torres to other gang members, in noncoercive settings, and they included details such as the names of the participants. (See *Arceo, supra,* 195 Cal.App.4th at p. 577; *Arauz, supra,* 210 Cal.App.4th at p. 1401.) Thus, the trial court did not abuse its discretion by finding that the statements were reliable. (See *Valdez, supra,* 55 Cal.4th at p. 143.)

The statements were also specifically disserving of each declarant's penal interest. Sanchez's statements to Lopez included "we got him" and a description of how Sanchez had driven to Roache Road and stayed in the car while Meza and Torres "took care of it." Despite disclaiming that he had been one of the shooters, Sanchez was admitting participation rather than blame-shifting, and thus "clearly subjecting [himself] to criminal liability" when making the statements. (*Arceo, supra,* 195 Cal.App.4th at p. 577; see also *Arauz, supra,* 210 Cal.App.4th at p. 1401.) Sanchez's statements to Melgoza were very similar: Sanchez admitted driving the car while the others "threw down," and he indicated that the homicide was what he had intended, by saying "everything came out really nice." Torres's statements to Lopez included a description of how he had volunteered to go on the mission to show Meza "how it's done;" how he had shot Campos first, in the face; and how he had subsequently encouraged Meza to shoot Campos also. In these statements, Torres clearly subjected himself to criminal liability for the murder; he did not simply "admit[] some complicity but place[] the major responsibility on others." (See *Duarte, supra,* 24 Cal.4th at p. 612.)

We conclude the trial court did not abuse its discretion by admitting the Sanchez and Torres statements as declarations against interest.

### F.     *Instructions on Codefendants' Statements*

Meza contends that the trial court gave incorrect, confusing, and conflicting instructions regarding the use of his codefendants' statements. Meza contends the

35

instructions violated his rights to due process, a fair trial, and a reliable jury verdict, under the Fifth, Sixth, and Fourteenth Amendments as well as under the state constitution. Sanchez joins in this argument.

### 1. Accomplice Testimony Instructions

Meza's first claim is that the instructions on accomplice testimony were erroneous because the instructions "left it to the jurors to determine whether [Sanchez and Torres] were accomplices." Meza contends that the trial court should have instructed the jury that Sanchez and Torres were accomplices as a matter of law, such that their testimony had to be corroborated and their statements viewed with caution.

The relevant instructions provided as follows: "You have heard evidence that defendant Angel Torres made oral statements before the trial to Jose Gonzalez and/or Christian Lopez. You must decide whether he made any such statement in whole or in part. [¶] . . . [¶] If you decide that Angel Torres made an oral statement or statements before trial, in reaching a verdict as to defendant Joel Sanchez or defendant Jose Meza, you must first decide whether Angel Torres is an accomplice." The instruction told the jury how to determine whether Torres was an accomplice, then stated: "If you decide that Angel Torres was an accomplice, then you may not convict Joel Sanchez or Jose Meza based on Mr. Torres' out-of-court statement alone. . . ." The instruction also reiterated the accomplice corroboration requirements. This instruction was then repeated with the references to Torres replaced by references to Sanchez. The instruction was also repeated another time, with regard to Sanchez's oral statements to Melgoza.

Meza relies extensively on *People v. Robinson* (1964) 61 Cal.2d 373 (*Robinson*). In *Robinson,* three defendants (Robinson, Hickman, and Guliex) were convicted of first degree murder at a joint trial. Each of the defendants had confessed to the crime, and at trial, Hickman had admitted that his confession was true. The jury instructions had permitted the jury to determine whether Hickman was an accomplice. (*Id.* at p. 394.) The appellate court held that Hickman's testimony admitting the truth of his confession

36

"made Hickman an accomplice, as a matter of law, and the court should have so instructed the jury." (*Ibid.*) The *Robinson* court explained the significance of the error: "By telling the jury that corroboration of his testimony was required only if they found [Hickman] to be an accomplice, the court impliedly and erroneously authorized the jury to find him *not* an accomplice, thereby making corroboration unnecessary." (*Ibid.*)

*Robinson* is distinguishable for several reasons. First, *Robinson* involved "testimony" subject to section 1111, since the accomplice in that case testified. In the present case, we have previously concluded that, for purposes of the accomplice testimony requirement of section 1111, the trial court properly declined to instruct the jury that Sanchez was an accomplice as a matter of law, because Sanchez's out-of-court statements did not constitute "testimony" within the meaning of section 1111. (See part III.D, *ante*.) The same analysis applies to Torres's out-of-court statements, which were not made under " ' "suspect circumstances" ' " and thus did not constitute "testimony" (*Brown, supra,* 31 Cal.4th at p. 555), since they were made to fellow gang members, in informal settings, as opposed to police questioning or similar circumstances.

*Robinson* is also distinguishable because it involved a codefendant's admission of guilt during trial. In the instant case, none of the codefendants confessed to the charged offenses at trial. "[I]f the facts are disputed or susceptible of different inferences, the question whether the witness is an accomplice should be submitted to the jury. [Citations.]" (*People v. Mayberry* (1975) 15 Cal.3d 143, 159.) Here, although the evidence very strongly supported a finding that Sanchez and Torres were accomplices to Meza, they disputed their roles in the homicide and argued that they did not aid and abet the homicide. For instance, during arguments to the jury, Torres suggested that he had been misidentified by his nickname, and he argued that there was no corroboration of his participation. Since the evidence was at least arguably susceptible of the inference that the codefendants were not accomplices, that question was properly submitted to the jury.

37

Finally, even if Sanchez and Torres were accomplices as a matter of law, the trial court did not err by leaving that determination to the jury. Had the trial court instructed the jury that Sanchez and Torres were accomplices as a matter of law, that instruction would have "unfairly prejudice[d]" those codefendants by imputing their guilt. (*People v. Hill* (1967) 66 Cal.2d 536, 555-556.) Such an instruction would have effectively told the jury that the codefendants were guilty of the charged offenses, "thereby invading the province of the jury with respect to the determination of [his] guilt or innocence." (*People v. Valerio* (1970) 13 Cal.App.3d 912, 924.) Under these circumstances, the trial court was "compelled to leave the matter to the jury," and it correctly did not instruct the jury that the codefendants were accomplices as a matter of law. (*Ibid*.)

### 2. Instruction on Coconspirator's Statements

Meza next contends the instruction on coconspirator statements was confusing. CALCRIM No. 418 was given as follows: "In deciding whether the People have proved any of the defendants committed the crime of murder, you may not consider any statement made out of court by any of the defendants unless the People have proved by a preponderance of the evidence. Preponderance of the evidence [is] the one time you'd have a different burden of proof than beyond a reasonable doubt. [¶] So in deciding whether the People have proved that any of the defendants committed the crime of murder, you may not consider any statement made out of court by any of the defendants unless the People have proved by a preponderance of the evidence that (1) some evidence other than the statement itself establishes that a conspiracy to commit that crime existed when the statement was made[,] (2) any two of the defendants or any one defendant and Jose Gonzalez and/or Christian Lopez were members of and participating in the conspiracy when a defendant made the statement[, (3)] a defendant made the statement in order to further the goal of the conspiracy; and, [(4)], the statement was made before or during the time that a defendant was participating in the conspiracy. . . ."

38

After reading CALCRIM No. 418, the trial court instructed the jury on conspiracy to commit assault with a deadly weapon. (See CALCRIM No. 415.) The trial court then noted, "Some of you may be confused by why we're talking about conspiracy. None of the defendants are charged with conspiracy. We give you these instructions so you can evaluate how to use any of the alleged out-of-court statements of the defendants or other alleged conspirators."

In arguing that CALCRIM No. 418 was confusing as given, Meza references only the first two sentences of the challenged instruction, contending that the trial court permitted the jurors to "use the uncorroborated statements of the co-defendants as substantive evidence of Meza's guilt, if they found the statement was made by a preponderance of the evidence." This argument takes the first two sentences of the instruction out of context. As we previously noted, "in determining the correctness of jury instructions, we consider the instructions as a whole" (*Friend, supra,* 47 Cal.4th at p. 49), we presume that jurors are "able to understand and correlate instructions" (*Sanchez, supra,* 26 Cal.4th at p. 852), and we examine "whether there is a reasonable likelihood that the jury misconstrued or misapplied" the instructions (*Clair, supra,* 2 Cal.4th at p. 663). When the first two sentences are considered in the context of the rest of the instruction, there is no reasonable likelihood that the jury would have believed it could consider a codefendant's statement against another codefendant merely because it found, by a preponderance of the evidence, that the statement *was made*. The full instruction clearly informed the jury that the preponderance of the evidence standard applied to all four requirements for considering the statement.

We conclude the instruction on coconspirators' statements was not confusing.

### 3. Instructions on Sanchez's Statements

Meza next contends that the instructions on Sanchez's statements to Melgoza permitted the jury to consider those statements "without any requirement of corroboration," even if they found Sanchez to be an accomplice.

Meza specifically points to the modified version of CALCRIM No. 358, which was read to the jury as follows: "You have heard evidence that defendant Joel Sanchez made an oral statement and/or statements to Julian Melgoza before the trial. You must decide whether the defendant Joel Sanchez made any such statement or statements in whole or in part. [¶] If you decide that the defendant Joel Sanchez made such a statement to Julian Melgoza, consider the statement along with all the other evidence. It is up to you to decide how much importance to give to the statement. Julian Melgoza is not an accomplice as defined in the previous instruction. [¶] Consider with caution any statement made by a defendant tending to show his guilt unless the statement was written or otherwise recorded."

CALCRIM No. 358 informed the jury how to consider an out-of-court statement generally, but it was given along with the more specific instructions on accomplice testimony and the requirement of corroboration. When the instructions are considered "as a whole" (*Friend, supra,* 47 Cal.4th at p. 49), and correlated with one another (*Sanchez, supra,* 26 Cal.4th at p. 852), there is no "reasonable likelihood that the jury misconstrued or misapplied" the instructions (*Clair, supra,* 2 Cal.4th at p. 663) to permit consideration of Sanchez's statements to Melgoza without a corroboration requirement, if the jury found that Sanchez was an accomplice.

### 4.    Instructions on Accomplices

Meza contends that the jury had to be confused by the instructions requiring the jury to determine whether Sanchez and Torres were accomplices because other instructions stated that Gonzalez and Lopez were accomplices as a matter of law. However, as noted above, one of the reasons that the trial court properly declined to instruct the jury that Sanchez and Torres were accomplices as a matter of law, was that such an instruction would have effectively told the jury that the codefendants were guilty of the charged offenses. Gonzalez and Lopez, by contrast, were not on trial, and the jury was aware that Gonzalez had pleaded guilty to certain offenses related to his conduct in

40

the Campos shooting. We presume the jurors were able to understand that this distinction was the reason for the different accomplice instructions. (See *Sanchez, supra,* 26 Cal.4th at p. 852.)

### 5.      Corpus Delicti and Single Witness Instructions

Meza contends the corpus delicti instruction (CALCRIM No. 359) was confusing in light of the accomplice testimony instructions and the instruction on the testimony of a single witness (CALRIM No. 301).

CALCRIM No. 359 was given as follows: "A defendant may not be convicted of any crime based on his out-of-court statements and his codefendants['] out-of-court statements alone. You may only rely on the defendant's out-of-court statements and his codefendants['] out-of-court statements to convict him if you conclude that the other evidence shows the charged crime was committed. The other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] The identity of the person who committed the crime and the degree of the crime may be proved by the defendants['] statements alone. You may not convict a defendant unless the People have proved his guilt beyond a reasonable doubt."

CALCRIM No. 301 was given as follows: "Except for the testimony of Jose Gonzalez and Christian Lopez, which requires supporting evidence and any out-of-court statements made by any of the defendants to Jose Gonzalez and Christian Lopez, which also requires supporting evidence, the testimony of only one witness can prove any fact. [¶] Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

Meza contends that these instructions were confusing because they told the jury that the codefendants' out-of-court statements required corroboration if the statements were made to Gonzalez or Lopez or if the jury found that the codefendants were accomplices, but that corroboration was not required if the statements were made to someone else or if the codefendants were not accomplices. We disagree that these

41

concepts were necessarily confusing. Although the jury had to digest and correlate a large number of instructions concerning out-of-court statements by the codefendants, we presume the jury was able to do so. (See *Sanchez, supra,* 26 Cal.4th at p. 852.) The record does not contain any indicia that the jury was confused in the manner suggested by Meza.

### 6. Instruction on Meza's Statements

Meza contends the instruction on his own admissions was confusing and legally incorrect.

CALCRIM No. 358 was given as follows: "You have heard evidence that defendant Jose Meza made oral statements before the trial to Jose Gonzalez and/or Christian Lopez. You must decide whether he in fact made any such statements in whole or in part. If you decide that Jose Meza made such an oral statement or statements before trial, in reaching a verdict as to Jose Meza, consider the statements and consider them subject to . . . [CALCRIM No.] 335, which is the [instruction] about viewing the testimony of an accomplice[] with caution. And view it along with all of the other evidence. [¶] It is up to you to decide how much importance to give to the statement or statements. [¶] Consider with caution any statement made by a defendant tending to show his guilt unless the statement was written or otherwise recorded."

Meza argues that the trial court should not have modified CALCRIM No. 358 to refer the jury to CALCRIM No. 335, claiming that the instruction permitted the jury to use Meza's statements against him only if they were corroborated. Again, however, the record does not indicate any of the jurors were unable to understand these instructions, and we presume the jury was able to correlate the various instructions on out-of-court statements. (See *Sanchez, supra,* 26 Cal.4th at p. 852.)

42

### 7. Conspiracy Instructions

Finally, Meza contends the conspiracy instructions were legally incorrect and confusing, since they did not tell the jury that a defendant cannot be found to be a conspirator based on the uncorroborated testimony of an accomplice.

Meza again relies on *Robinson, supra,* 61 Cal.2d 373. However, in that case, the prosecution did not offer any of the codefendants' out-of-court statements against the other codefendants. Instead, the codefendants' statements were "admitted solely as against the individual." (*Id.* at p. 396.) Also, in *Robinson*, the trial court gave "14 instructions on the law of conspiracy," which was "more instructions than were given on any other issue in the case." (*Ibid.*) Additionally, "the entire issue of conspiracy was moot." (*Id.* at p. 397.) None of those factors is present in the instant case. Thus, we conclude that the conspiracy instructions were not erroneous or confusing.

### G. *Cumulative Prejudice Arguments*

Both Sanchez and Mesa contend that even if none of the asserted trial errors individually compel reversal of their convictions, there was cumulative prejudice stemming from the aggregation of errors. Sanchez contends that the cumulative effect of the errors violated his right to due process under the Fourteenth Amendment and his Sixth Amendment rights to present a defense, confront the evidence against him, and have a jury determine the elements of the offense beyond a reasonable doubt.

We have found no error with respect to the aiding and abetting instructions. We have found that there was sufficient evidence to support the jury's findings regarding the "primary activities" requirement of section 186.22, subdivision (f), and we have found that any error in admitting testimonial hearsay to prove the "pattern of criminal gang activity" (*id.*, subds. (e) & (f)) was harmless beyond a reasonable doubt. We have found that the trial court did not err by not instructing the jury that Sanchez was an accomplice as a matter of law and that the trial court did not err by admitting the out-of-court statements of Sanchez and Torres against Meza. We have also found that the jury

43

instructions regarding the use of the codefendants' statements were not incorrect, confusing, and conflicting. Thus, there was no prejudicial error to cumulate.

### H. *Abstracts of Judgment*

Sanchez contends his abstract of judgment must be corrected to delete the reference to a waiver of appellate rights. The Attorney General agrees that Sanchez waived only the reading of his appellate rights, and that the abstract of judgment should be corrected. In addition, Meza's abstract of judgment incorrectly reflects he was convicted of first degree murder. We will order the trial court to correct the abstracts of judgment.

## IV. DISPOSITION

The judgment is affirmed. As to defendant Sanchez, the trial court is ordered to correct the abstract of judgment to delete the reference to a waiver of appellate rights. As to defendant Meza, the trial court is ordered to correct the abstract of judgment to reflect his conviction of second degree murder rather than first degree murder.

44

_____
BAMATTRE-MANOUKIAN, ACTING P.J.



WE CONCUR:




_____
MIHARA, J.




_____
GROVER, J.